# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE

Plaintiff and Respondent,

v.

RYAN JAMES HOYT,

Defendant and Appellant.

S113653

Santa Barbara County Superior Court

1014465

_____

January 30, 2020

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Groban concurred.

_____

.

PEOPLE v. HOYT

S113653

Opinion of the Court by Kruger, J.

Defendant Ryan James Hoyt was convicted of the kidnap and murder of Nicholas Markowitz and sentenced to death. We affirm the judgment.

## I.    BACKGROUND

On October 30, 2000, defendant was charged by grand jury indictment with kidnapping 15-year-old Nicholas Markowitz (who was known as Nick) for ransom or extortion and for murdering him, as well as a personal firearm use enhancement. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)(B), 209, subd. (a).)   Codefendants Jesse James Hollywood, Jesse Rugge, Graham Pressley, and William Skidmore were charged with the same crimes, but the cases were severed and defendant stood trial first.  A jury convicted defendant of one count of first degree murder in violation of Penal Code section 187 and one count of kidnapping committed with the personal use of a firearm in violation of Penal Code sections 207 and 12022.5, respectively. The jury also found true the special circumstance allegation that the murder was committed during the course of a kidnapping under Penal Code section 190.2, subdivision (a)(17)(B).  The jury returned a verdict of death.  This appeal is automatic.  (*Id.*, § 1239, subd. (b).)

## A.      Guilt Phase Prosecution Case

The events that led to Nick's kidnap and murder stemmed from a feud between Jesse James Hollywood and Nick's half-brother, Ben, over a drug debt.  Ben was supposed to have sold illegal drugs for Hollywood but failed to do so.  As a result, Ben owed Hollywood $1,200, and their relationship had soured over this debt.  On one occasion, Hollywood retaliated against Ben by running up a tab in the restaurant where Ben's girlfriend worked and leaving a note saying Ben could pay the bill from the debt he owed Hollywood.  For his part, Ben took revenge on Hollywood by telling Hollywood's insurance company that Hollywood had falsely reported a vehicle stolen.  Ben later broke windows in Hollywood's home.  Although there was conflicting testimony about precisely when the windows were broken, one prosecution witness testified the event occurred on August 4, 2000.  The next day, Hollywood would inform others that he needed to move because his windows had been "busted out" and people knew where he lived.  The day after that, Hollywood arranged to have Nick kidnapped.  A few days later, worried about the serious penal consequences if that crime was discovered, Hollywood decided to eliminate Nick.

Hollywood enlisted defendant's help.  Defendant, like Ben, sold drugs for Hollywood, and he also owed Hollywood money. Mutual friends described defendant as the "low man on the totem pole" in their circle.  To pay for the drugs he purchased from Hollywood for resale, defendant performed—and was often teased for doing—menial, odd jobs for Hollywood, including yard work, pet care, and housework.  According to Brian Affronti, a friend of both defendant and Hollywood, defendant did whatever Hollywood asked of him, without complaint.  Defendant agreed to carry out the killing, along with two accomplices, in exchange

for financial compensation including the forgiveness of his debt to Hollywood.

**Timeline**

### 1. August 5, 2000

The events leading up to the crimes began on Saturday, August 5, 2000, when Casey Sheehan, who also sold marijuana for Hollywood, delivered a van to Hollywood's West Hills home.[1] Hollywood had told Sheehan that Hollywood needed to move because people knew where he lived. When Sheehan arrived at Hollywood's home, defendant, Skidmore, and one other friend were there, drinking beer and smoking marijuana. Some hours later, Sheehan, Hollywood, and Skidmore met again at Sheehan's apartment, where Hollywood and Skidmore talked about driving to Santa Barbara for a local party known as Fiesta.

That same evening, Nick returned home a half hour before his midnight curfew. His parents noticed he looked "glazed," his speech was slurred, and he had a bulge in his pocket. When they confronted him, he ran out of the house and did not return for an hour. When he returned, he agreed to speak with his parents in the morning. Nick's parents worried that he had been getting involved with drugs, in part because Ben was a drug user.

### 2. August 6, 2000

On the morning of Sunday, August 6, two passersby saw a dark-haired teenager being beaten by four other similar-aged boys in West Hills. Both the assailants and their victim appeared to be Caucasian. When the assailants were done

---

[1] As the jury was informed, Sheehan testified under a grant of immunity, which would be void if he failed to be truthful.

hitting and kicking the dark-haired boy, they threw him into a white van.

Affronti testified that at about 2:00 that afternoon, Hollywood, Skidmore, and their friend Jesse Rugge picked him up in a white van to drive to Santa Barbara for Fiesta. When Affronti entered the van, he saw Nick in the back. Affronti knew Ben, but he did not initially realize Nick was Ben's younger brother. Affronti did not know anything was out of the ordinary until Hollywood told Nick "that his brother was going to pay up his money" and "for Nick not to run or anything like that, not to try and do anything irrational."

When the men arrived in Santa Barbara, they stopped at an apartment belonging to Richard Hoeflinger, a longtime friend of Rugge's. Hollywood asked Affronti to park the van and directed Rugge to make calls from Affronti's cell phone to unknown recipients. Telephone records also showed that two phone calls were placed that afternoon from Hoeflinger's home to defendant's home phone number. Hollywood and Skidmore then went into the apartment with Nick. When Affronti entered after parking the van, he saw Nick in a bedroom with his hands duct-taped in front of him and his shins also taped. Hollywood and Rugge then left for a time; when Hollywood returned, Affronti and Skidmore left in the van.

Hoeflinger, the apartment's primary tenant, had not seen his friend Rugge for a while before Rugge stopped by on August 6. Rugge asked if he could come in and Hoeflinger readily agreed, but Hoeflinger was surprised when a group—which included Nick—came in with Rugge. Emilio Jelez, Jr., Hoeflinger's roommate at the time, and their friend Gabriel Ibarra were also at the house when Rugge and others arrived

with Nick. Jelez and Ibarra saw Nick sitting in a bedroom of the house with his wrists and ankles bound with duct tape. Ibarra had never met Hollywood, but testified he did not call the police or tell anyone what he had seen because he was afraid of Hollywood after Hollywood walked up to Ibarra, intimated he had a gun, "and pretty much threatened [Ibarra], told [him] that [he] better keep [his] F'ing mouth shut."

At some point that evening, Hoeflinger walked into his bedroom and saw Rugge and Skidmore removing duct tape from Nick's wrists. Skidmore assured Hoeflinger that everything was " 'cool' " and they were " 'just talking' " to Nick. Reassured, Hoeflinger left his house less than a half hour later to attend a barbecue. Hoeflinger returned home at dusk to find Nick and Rugge drinking alcohol together in his living room with Nick still unbound. Nick and Rugge then left Hoeflinger's home together a few hours later.

In the meantime, Affronti and Skidmore drove back to Los Angeles in the white van. Affronti realized en route that he had forgotten his cell phone and returned to Hoeflinger's home to retrieve it; there he saw Nick and Hollywood still spending time together. Back in Los Angeles, Skidmore dropped Affronti off at home and continued to Hollywood's house, where he met defendant. Skidmore did not mention Nick. Defendant and Skidmore returned the van to its owner. Defendant and Skidmore walked back to Hollywood's house, where defendant left Skidmore.

3. *August 7, 2000*

     a. *Nick Spends the Day in Santa Barbara*

On the morning of August 7, Natasha Adams-Young, then age 17, met Nick at Rugge's house in Santa Barbara. Adams-Young had been spending time with Rugge that summer. After meeting Nick, Adams-Young spoke with Pressley, a mutual friend of hers and Rugge's. Pressley told her "that they, quote unquote, kidnapped this kid [Nick] and brought him back up here to Jesse Rugge's house." The group then caravanned to Adams-Young's house. Adams-Young, feeling concerned for Nick's welfare, spoke with Nick, and suggested he was free to leave. Nick declined, explaining to Adams-Young that he planned "to stick around" "to help out his brother and that he was fine."

The group eventually returned to Rugge's home. Hollywood and his girlfriend, Michele Lasher, met up with the group there. Then-16-year-old Kelly Carpenter, another mutual friend of Adams-Young and Rugge, had met Hollywood the week before and knew that Hollywood, Rugge, and Pressley were involved with selling marijuana. Adams-Young understood that Nick's presence in Santa Barbara and at Rugge's home was related to Hollywood in some fashion.

At Rugge's home, Nick remained in a separate bedroom talking to Rugge. Carpenter overheard Hollywood speaking to his girlfriend about their plans that night and also heard Hollywood talking to others about what he would do with Nick. Hollywood said he might tie Nick up, throw him in the backseat of the car, and then get something to eat. Although it was said in a joking manner, the comment made Carpenter

6

uncomfortable. Carpenter and Adams-Young left Rugge's house shortly thereafter.

### b. *Hollywood Confesses the Kidnapping to Sheehan*

Sheehan testified that Hollywood and Lasher socialized at Sheehan's apartment later on the night of August 7, drinking alcohol and smoking marijuana with him. Sheehan conceded he was "probably" "pretty wasted" and did not recall whether Hollywood and Lasher spent the night. Sheehan did recall Hollywood telling him he had taken Nick to Santa Barbara on Sunday, August 6. Hollywood, Rugge, Affronti, and Skidmore "pulled over" and "picked up" or "grabbed" Nick while he was walking down the street. Sheehan did not believe anyone other than those four men were involved in Nick's capture. Hollywood told Sheehan that Nick was still staying with Rugge in Santa Barbara on August 7.

### 4. *August 8, 2000*

Nick's parents reported their son missing on Tuesday morning, August 8, after finally reaching Ben and realizing Nick was not with him.

### a. *Nick's Time in Santa Barbara*

Adams-Young testified that Nick was still at Rugge's house when she returned there the morning of August 8. Adams-Young was concerned with Nick's continued presence in Santa Barbara when "he wasn't supposed to be" there and discussed the issue with Pressley and Carpenter. Pressley told Adams-Young he was not sure what he planned to do "but that they weren't going to hurt [Nick] in any way and that they were just waiting to get a call from Jesse Hollywood." Pressley also told Adams-Young that "Hollywood had called Jesse Rugge and

7

offered him money to kill Nick Markowitz." Adams-Young recalled "being shocked and appalled," and Pressley assured her he had no plans to kill Nick but also confessed he was not sure what should be done with Nick. Pressley believed they were all in danger.

Adams-Young returned to Rugge's home and confronted him. Rugge told Adams-Young he was not sure what he should do, but "knew he was going to take Nick home" and planned to provide him with a bus ticket, though he feared Nick would tell someone about the kidnap when he returned home. Rugge expressed concern about going to jail. Nick, who was present during this conversation, assured Rugge he would not tell anyone when he got home.

Shortly thereafter, Rugge suggested the group go to a motel for the evening. Pressley's mother drove Pressley, Carpenter, Rugge, and Nick to the Lemon Tree Inn, where the group stayed from 7:00 p.m. until 11:30 p.m. Rugge selected and paid for the motel. Once there, they were joined by a friend, Nathan Appleton, and Adams-Young met up with the group later. The mood was celebratory, as Adams-Young and Carpenter believed Nick would be going home that evening. Nick spoke happily about what he would do once he returned home. Around 11:00 or 11:30 p.m., Rugge asked Adams-Young, Appleton, and Carpenter to leave for the night.

b. *Hollywood's Activities on the Evening of August 8, 2000*

On August 8, Hollywood visited the home of Stephen Hogg, a criminal defense attorney who had a professional relationship with both Hollywood and his father, John. Hollywood explained to Hogg that acquaintances had picked up

8

the brother of the man who had damaged his home and had taken the brother to Santa Barbara. Hollywood sought Hogg's advice. When Hogg suggested Hollywood go to the police, Hollywood said he could not do that. Hogg described to Hollywood the penalties for kidnapping as eight years, or—if ransom was sought—life. Hollywood made clear that this was something other people had done and that he was personally uninvolved. Hollywood became agitated and left Hogg's home within five minutes of Hogg's explaining the potential penalties for kidnapping. Hogg tried to page Hollywood several times after Hollywood left, but Hollywood did not respond.

On the evening of August 8, Hollywood and Lasher went to Sheehan's apartment to borrow Sheehan's car. Hollywood ran an errand in the car while Lasher stayed at the apartment. Hollywood then returned without the car, and all three went out to dinner to celebrate Lasher's birthday.

### 5. *August 9, 2000–August 17, 2000*

#### a. *Hollywood's Father Rushes Home*

Hollywood's father, John, testified that on the evening of August 8, he contacted Hogg and learned that Hollywood had "a problem" or was "in trouble." John was on vacation in Big Sur but left for home after learning his son might be in trouble. John tried unsuccessfully to reach his son numerous times on his way home. John finally reached Hollywood via Lasher, and Hollywood directed him to Lasher's home. John arrived at Lasher's Calabasas home at 2:00 a.m. on the morning of August 9 to find his son looking "nervous and rattled." John understood that Hollywood believed his life was in some danger, that Hollywood and Ben had been in a feud for some time, and that

Hollywood's agitation was related to the kidnapping of Ben's younger brother.

### b. Hollywood's Father Contacts Defendant

Later that day, John paged defendant and asked to meet at a park. John asked defendant what was " 'going on with this situation, you know, this kid' " and suggested they go " 'find out where he is,' " " 'go get him and take him home.' " Defendant told him that "he didn't have control of the situation. And he, you know he was trying to find out, but he wasn't having any luck." John told defendant that when he asked his son where Nick was and who was holding him, Hollywood had not provided those details and instead told John to call defendant. Defendant told John he did not know those details either, but "would see what he could find out." John and defendant agreed this was "a bad situation," and defendant indicated that "he wasn't involved in this thing from the start, and he was kind of irritated that he was even being dragged into it."

### c. Sheehan and Defendant Spend Time Together

When Sheehan came home from work on the afternoon of August 9, he noticed the car he had loaned to Hollywood the day before had been returned. That evening, Hollywood, Affronti, Skidmore, Lasher, and defendant were at Sheehan's home. Defendant told Sheehan that "a problem was taken care of." Sheehan understood this to refer to Nick. When Sheehan asked defendant to elaborate, defendant initially said it was "best that [he] left things unsaid," but eventually confessed that "Nick had been killed."

10

After this conversation, Sheehan drove defendant to a store where defendant purchased shirts, pants, and shoes totaling a "couple hundred dollars," paying in cash. Sheehan did not believe defendant was working at the time, and he had known that defendant was in debt to Hollywood. Defendant assured Sheehan that the debt to Hollywood "was taken care of." In fact, Hollywood had given defendant "three or four hundred bucks" the day before his birthday and told defendant, "[W]e're straight. No more debt." Defendant spent the night at Sheehan's house that evening and celebrated his 21st birthday the next day. After enjoying a party with between 20 and 30 guests at Sheehan's home, defendant again spent the night there.

A few days later, Sheehan and defendant again discussed Nick's killing. Defendant told Sheehan they killed Nick somewhere in Santa Barbara. Defendant described picking Nick up from a motel and taking him to a site where they "shot him and put him in a ditch," and covered him with a bush. Sheehan and defendant were together when defendant was arrested; Sheehan was also arrested and released that same evening.

### d.  Nick's Body Is Discovered

On August 12, 2000, a group of hikers, including witness Darla Gacek, were hiking in the Los Padres National Forest in Santa Barbara County. They were passing through an area known as Lizard's Mouth, which is situated approximately three and one-half miles from Highway 154. The hikers heard what they thought was a swarm of bees coming from a location approximately one-quarter mile beyond the point where vehicles can go no further. The group saw brush piled high, and when

they began removing it, they realized a human might be buried beneath it. The group of hikers left the site to find a cell phone to call the police. They encountered a group filming nearby.

Lars Wikstrom, a film video editor, had gone to the Lizard's Mouth area that day to help friends film a music video. While Wikstrom was filming there, a man pointed out an area to him about 20 to 30 yards away. Wikstrom followed the man, initially noting a strong odor similar to that of a dead animal by a roadside. As the two got closer, Wikstrom could see and hear numerous flies near the ground. Wikstrom saw fine powder on the ground, and then noted what appeared to be Levi's denim jeans and part of a shirt. Because Wikstrom was unsure whether what he saw was a person, he decided to call the police. Wikstrom waited for the police to come, directing hikers away from the area.

Law enforcement arrived about an hour and a half after Wikstrom called. Detective William Michael West, one of the first detectives at the scene, observed cut brush along the entire trail, from the trail head at West Camino Cielo all the way to the location of the shallow grave. Detective West testified that "[i]t looked like somebody had cleared the trail," both at the gravesite and all along the trail.

Criminalist George Levine also responded to the scene. Nick's body was only lightly and partially covered with dirt. The weather that day and for a few days before was warm, resulting in significant decomposition. Law enforcement officials removed cartridge casings and a bullet from the first few inches of the shallow grave. After the body was removed from the site, a TEC-9 weapon, modified to be fully automatic, was found under the area where Nick's feet had been resting. Nick's mouth

had been duct-taped. Duct tape was also wrapped around Nick's hands and head.[2]

An autopsy revealed Nick had suffered a total of nine gunshot wounds. Several of the gunshots would have independently been fatal, but due to the level of decomposition the medical examiner was unable to state which of the injuries caused Nick's death.

### e. *Pressley Confesses to Digging the Gravesite*

Detective Jerry Cornell testified that he interviewed Pressley on August 16, and Pressley admitted digging a grave in the trail area off San Marcos Pass known as Lizard's Mouth in the early morning hours of August 9.

### f. *Defendant Confesses to the Killing*

On August 16, defendant was arrested, taken to a Santa Barbara jail, and advised of his *Miranda* rights.[3] According to Detective West, defendant said that he decided to speak to detectives after seeing a television broadcast regarding the case and speaking to his mother. After defendant informed jail officials he wished to be interviewed, detectives met with defendant in the sheriff headquarters in Goleta, where they audio- and video-recorded their encounter with him. Defendant

---

[2] Once the tape was removed at the morgue, Nick was seen to be wearing a ring. Nick also wore a distinctive belt buckle. The parties stipulated to the identification of the deceased at trial.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

was re-*Mirandized* and asked to explain why he was involved in the crime.

Defendant told Detective West and Sergeant Ken Reinstadler, "I'm going down. I, I just realized that." The detectives asked defendant to explain "how this went down," and defendant asked if they would "mind if I go back to my cell and think about [it] tonight and talk to you guys tomorrow because I know my arraignment is Monday." Defendant expressed concern that what he said would be repeated in court, but then requested water and continued the conversation with the detectives, explaining, "I had nothing to do with the kidnapping." Defendant asked why he was charged with that crime.[4] The detectives responded by urging defendant to tell his story.

Defendant told them Ben owed Hollywood significant sums of money, as did he. Defendant explained he was told he could erase his own debt in exchange for killing someone; the person was someone unknown to him. Defendant told detectives

---

[4] Defendant alleges the transcript used at trial contained two inaccuracies. After his assertion to detectives that he had nothing to do with the kidnapping, the transcript given to jurors indicated that there was some whispering before defendant asked why he was charged. A later-filed corrected transcript of the interview indicates that Reinstadler had responded to defendant's initial assertion that he had nothing to do with the kidnapping by whispering, "We know that." Defendant also claims the transcript used at trial contained an error in an exchange during which defendant indicated he met someone at the Lemon Tree Inn. At trial, the transcript read, "WEST: You met someone there? HOYT: Nick." The corrected transcript reads, "WEST: You met someone there? HOYT: Yeah." These discrepancies do not affect our evaluation of the issues in this case.

he drove Sheehan's car to a motel in Santa Barbara. When asked what happened next, defendant said, "You guys know what happened. I think I'm going to stop there for now." He again requested water, then expressed concern for his family's well-being.

Sergeant Reinstadler reminded defendant that he had the right to stop speaking to them at any point. Detective West offered to let defendant "collect [his] thoughts," and defendant said he wished "more than anything" that he had a cigarette. Sergeant Reinstadler reminded defendant, "You wanted to talk to us, man." Defendant asked whether he had been helpful, and the detectives urged him to fill in more "piece[s] of the puzzle." Reinstadler asked him, "Who are you ultimately concerned with? Who, who do you feel sorry for here?" Defendant replied, "Not me," continuing, "That kid I buried." Reinstadler asked him if he was "[w]ak[ing] up thinking about someone saying, 'Please. Please.'" The detectives asked if that was what the duct tape around the victim's mouth was for, and defendant replied, "Close."

Reinstadler asked defendant if he put the duct tape on Nick's mouth, but defendant denied doing it. Reinstadler then asked whether Jesse did it, and defendant said Hollywood was not in Santa Barbara. Reinstadler clarified he meant Jesse Rugge, not Jesse Hollywood, and told defendant that Rugge had said that defendant placed the duct tape around Nick's mouth. Defendant replied, "I love this one. *The only thing I did was kill him.*" Defendant added that he did not select the gravesite or dig the grave; Pressley, whom he had not previously known, handled both those tasks. The detectives asked defendant if he had any moments of feeling what he was doing was wrong, and he said he did think that, for a moment, "right before."

15

**B.      Defense Case**

*1.      Defendant's Testimony*

Defendant testified on his own behalf.  He acknowledged that he was friends with, and sold drugs for, Hollywood.  He was indebted to Hollywood and did odd jobs, including yard work, to reduce his debt.

On August 5, 2000, defendant helped Hollywood pack up his house.  Someone had broken the windows of the house, and Hollywood had received a voicemail that Ben, who sometimes sold marijuana for Hollywood, was the culprit.  Defendant finished cleaning up the broken glass and went to his grandmother's home around 10:00 p.m. that evening.

On August 8, 2000, at around 2:30 p.m., defendant went to Hollywood's home.  He and Hollywood drove around for a while, and Hollywood seemed excited.  Hollywood asked if defendant would like to work off the last $200 of his debt by delivering a package to Rugge in Santa Barbara.  Defendant testified that Hollywood told him if he delivered the package, his debt would be "clear" by his birthday a few days later. Defendant was to drive Sheehan's car.  Defendant assumed Hollywood was not going himself because he was celebrating his girlfriend's birthday.  Defendant agreed, and Hollywood told him where Rugge was staying and gave him a phone number to reach Rugge.  Defendant testified he then waited at Hollywood's home for about three or four hours, at which point Hollywood picked up defendant and took him to Sheehan's home to pick up Sheehan's car.  Hollywood gave defendant a bag to deliver to Rugge, and defendant testified that he did not look inside, presuming it to contain marijuana.  No one mentioned anything about Nick to defendant.

Defendant drove to Santa Barbara. He called Rugge from a mini-market off the highway, and Rugge directed him to a room at the Lemon Tree Inn. Defendant delivered the bag, annoyed that Pressley was in the room because defendant had asked that Rugge be alone. Rugge asked defendant to drive him back to the San Fernando Valley in the morning, and defendant agreed. Rugge and Pressley borrowed the car for several hours, returning to the room about 2:30 a.m. Once they returned, defendant and Rugge drove back toward Los Angeles. Defendant dropped Rugge off at Rugge's mother's home. Defendant then drove to his grandmother's house, where he was then living.

Defendant testified that he did not hear of Nick's death until the evening of August 12, when Skidmore told him that "Ben's brother had been found murdered." Several days later, defendant learned Skidmore had been arrested. Defendant began calling mutual friends, including Sheehan, who told defendant "he didn't want [him] at his house." Defendant did not heed Sheehan's request. Defendant received several pages from a number he did not recognize, and believed police were trying to reach him. Defendant asked Sheehan to take him to a pay phone so he could call the police. He was arrested shortly thereafter.

Following his arrest, he was eventually taken to Santa Barbara, although he did not recall events with specificity. He recalled throwing up and knew he called his mother but claimed to have no memory of the content of the phone call. In fact, defendant testified that he recalled nothing from the time of his arrest on August 16 until he woke up alone in a jail cell four days later. He did not remember his confession to detectives on August 17.

Defendant's taped confession was played for the jury. Defendant testified that none of the statements indicating he was responsible for Nick's death were true.

### 2. Dr. Kania's Testimony

The defense proposed to call Dr. Michael Kania to testify that defendant's confession was false. Following an Evidence Code section 402 hearing, the trial court ruled that Dr. Kania could testify in response to hypothetical questions that assumed defendant suffered from amnesia, including the characteristics of amnesia. But the court ruled that Dr. Kania would not be permitted to "testify as to circumstances, the things that he was told by the defendant. The defendant can testify to those things."

Following the trial court's ruling, Dr. Kania testified that he believed defendant's claim of amnesia concerning his confession was credible. Defendant told Dr. Kania the only thing he recalled from the interrogation was walking into the room, being told to calm down, and to wait. Defendant told him the next thing he remembered was leaving the interrogation.

## C. Guilt Phase Rebuttal Case

Dr. David N. Glaser and Dr. Dana Chidekel testified for the prosecution in rebuttal. Dr. Glaser testified that after examining defendant and reviewing a great deal of case information, he concluded defendant suffered from "no current major mental illness." Dr. Glaser opined that defendant suffered from an avoidant personality disorder "with dependent features." He had low self-esteem, was willing to endure "unpleasant conditions" to remain near the person on whom he was dependent, and was uncomfortable acknowledging his feelings. None of these features, in Dr. Glaser's opinion, made

defendant more likely to falsely confess. Dr. Glaser also evaluated defendant for amnesia. Because defendant was unable to recall anything about his interview with police based upon cues given from the transcripts, and because total amnesia absent a traumatic event or general anesthesia is very uncommon, Dr. Glaser concluded that defendant was malingering.

Dr. Chidekel testified that she evaluated defendant and administered numerous psychological tests to determine whether defendant had a psychological disorder rendering him susceptible to falsely confessing. Dr. Chidekel determined defendant suffered from "avoidance [*sic*] personality disorder, with self-defeating and dependent features." Based on the tests administered, Dr. Chidekel was unable to diagnose defendant with any other neuropsychological condition that interfered with his "ability to see, to understand, or to be able to communicate effectively."

### D. Penalty Phase

#### 1. *Aggravation*

Nick's mother, Susan Markowitz, testified about the impact the loss of her son had on her and on her relatives and friends. Nick was one of three children, and his sister had the comfort of knowing Nick held his niece before his death, but not his sister's second child, who was not yet born at the time Nick died. Susan testified that she twice tried to commit suicide, "only to succeed in accumulating a twenty thousand dollar hospital bill." She told the jury, "There is no meaning to life without Nick."

## 2.    *Mitigation*

Victoria, defendant's mother, testified about defendant's dysfunctional upbringing. Victoria was 19 years old when she married defendant's father, James Hoyt, and 21 when she gave birth to defendant. Victoria testified that her husband was "extremely abusive" to her, and not nice or attentive to the children. James grabbed her by the hair and threw her against a car and to the ground when she was eight months pregnant with defendant, nearly resulting in miscarriage. When defendant was four years old, James threw Victoria to the ground in front of her children and beat her with a pipe wrench. James had to be physically restrained by Victoria's brother. The couple divorced when defendant was five years old and, despite the physical abuse, James was awarded custody. Following their divorce, Victoria began using cocaine and drinking heavily.

Victoria's sister, Anne Stendel Thomas, testified that defendant's father and mother verbally abused and threatened defendant throughout his childhood. Thomas testified that Victoria abused drugs and alcohol from an early age, and her alcohol abuse continued and worsened throughout defendant's childhood. Her family was dysfunctional, and Victoria had been a depressed child who would spend hours or days alone in her room without moving or talking. Thomas testified that defendant was a "sweet kid," and she viewed him—the middle child—as a mediator.

Victoria's mother, Carol Stendel, testified about Victoria's early childhood. When Victoria was in fourth grade, she would stand in class and walk around without being aware of her behavior, despite performing at or above grade level in her coursework. At age 14, Victoria began seeing a psychiatrist, who recommended she be hospitalized due to depression. The family

decided against treatment. Defendant's grandfather also suffered from depression.

Stendel made efforts to make her grandchildren feel welcome in her home. She worried the children would feel abandoned or abused by their parents. She testified that "in their young lifetime, nobody, I mean nobody really helped them to have safety and comfort." Her eldest grandchild—defendant's sister, Christina—was a heroin addict. Stendel testified that she loved defendant very much.

At the time of defendant's trial, his younger brother, Jonathan, was serving a 12-year prison sentence for armed robbery and conspiracy to commit home invasion. Jonathan committed the crimes as a 16 year old but was tried as an adult. Jonathan testified about their abusive family, particularly their abusive stepmother, and the physical abuse defendant suffered at their father's hands. When asked how he would feel if defendant were to receive the death penalty, Jonathan responded that he could "hardly take him being in jail period." He continued, "As far as putting him . . . on death row . . . , that's pretty awful." James, defendant's father, was asked about the effect on him if his son was sentenced to death. He responded that "[i]t would be a living nightmare you can't wake up from."

## II.   DISCUSSION

### A.   Jurisdictional Claim

Defendant's first claim on appeal concerns the superior court's jurisdiction to hear the case. The evidence indicates that the murder took place at or near the location where Nick's body was found in the area known as Lizard's Mouth, which is situated within the boundaries of the Los Padres National Forest. Defendant contends that because the murder took place

in a national forest, the case falls within the exclusive territorial jurisdiction of the courts of the United States, and thus outside the jurisdiction of the superior court.

Defendant did not raise this argument in the trial court, which would ordinarily bar him from raising it on appeal. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) But if, as defendant contends, the superior court lacked territorial jurisdiction, then it was without authority to act in the matter and should not have entered judgment in the case. (*People v. Betts* (2005) 34 Cal.4th 1039, 1050.) A claim of fundamental jurisdictional defect is not subject to forfeiture or waiver. (*People v. Lara* (2010) 48 Cal.4th 216, 225.) We are therefore obligated to address the claim. It is, however, without merit.

The fact the murder was committed within the boundaries of a national forest does not necessarily mean that the federal government, and the federal government alone, was empowered to prosecute the crime. As this court explained more than a century ago, federal ownership of land does not necessarily establish "federal jurisdiction over crimes committed upon it, as that fact does not oust the jurisdiction of the state . . . ." (*People v. Collins* (1895) 105 Cal. 504, 509.) "[F]or many purposes a State has civil and criminal jurisdiction over lands within its limits belonging to the United States," including the punishment of "public offenses, such as murder or larceny, committed on such lands." (*Utah Power & Light Co. v. United States* (1917) 243 U.S. 389, 404; see *People v. Rinehart* (2016) 1 Cal.5th 652, 660.) Whether the federal government has exclusive jurisdiction over crimes committed on federal lands depends on the terms on which the lands were acquired from the states. (See *Kleppe v. New Mexico* (1976) 426 U.S. 529, 542–543 [under enclave clause of the federal Constitution (U.S. Const.,

art. I, § 8, cl. 17), state may cede either exclusive or limited jurisdiction to federal government].) Defendant points to no authority indicating that the federal government acquired the Los Padres National Forest on terms establishing exclusive federal jurisdiction to prosecute crimes committed therein.

Defendant's argument against state criminal jurisdiction is rooted in an apparent misreading of California history. The Los Padres National Forest was first created by presidential proclamation in 1903, when it was known as the Santa Barbara Forest Reserve. (Pres. Proc. No. 14, 33 Stat. 2327, Dec. 22, 1903.)[5] As defendant notes, the national forest is made up of lands that had been ceded by Mexico in the Treaty of Guadalupe Hidalgo, under which title to lands not privately held passed to the United States. (Feb. 2, 1848, 9 Stat. 922; see *Thompson v. Doaksum* (1886) 68 Cal. 593, 596.) Defendant claims that Congress asserted exclusive jurisdiction over these lands when California was admitted to the Union two years later. (Act for the Admission of the State of Cal. into the Union, Sept. 9, 1850, ch. 50, § 3 (Act for Admission) 9 Stat. 452.)

Defendant is incorrect. The Act for Admission contains no provision reserving to the federal government exclusive jurisdiction over all public lands ceded by Mexico in the Treaty of Guadalupe Hidalgo. (See *Coso Energy Developers v. County of Inyo* (2004) 122 Cal.App.4th 1512, 1522–1523; accord, *Martin v. Clinton Construction Co.* (1940) 41 Cal.App.2d 35, 46; see generally *Fort Leavenworth R. R. Co. v. Lowe* (1885) 114 U.S. 525, 539.) Defendant relies on the noninterference clause of the Act for Admission: "That the said State of California is admitted

_____

[5] The Los Padres National Forest took its present name in 1936. (Exec. Order No. 7501 (Dec. 3, 1936).)

into the Union upon the express condition that the people of said State, through their legislature or otherwise, shall never interfere with the primary disposal of the public lands within its limits, and shall pass no law and do no act whereby the title of the United States to, and right to dispose of, the same shall be impaired or questioned." But this noninterference clause is not unique to California (see *Van Brocklin v. State of Tennessee* (1886) 117 U.S. 151, 164), and it offers no support for defendant's argument. Suffice it to say, a prohibition on interfering with federal title is not the same as a prohibition on prosecuting crime. (See *Coso Energy*, at pp. 1522–1523, citing *U.S. v. Bateman* (N.D.Cal. 1888) 34 F. 86, 88–90.)

In the alternative, defendant argues that California relinquished its prosecutorial power to the federal government in an 1891 act ceding "exclusive jurisdiction over such piece or parcel of land as may have been or may be hereafter ceded or conveyed to the United States, during the time the United States shall be or remain the owner thereof, for all purposes except the administration of the criminal laws of this State and the service of civil process therein." (Stats. 1891, ch. 181, § 1, p. 262.) That statute was reenacted in 1943 as Government Code section 113, subsequently repealed, and eventually reenacted in its current form to provide for the state's acceptance of the retrocession of jurisdiction from the federal government of "land within this state." (Gov. Code, § 113; see Stats. 1943, ch. 134, p. 898 [1943 version].)

The difficulty with this argument is that the cession provision on which defendant relies contains an explicit exception for "the administration of the criminal laws of this State." (Stats. 1891, ch. 181, § 1, p. 262.) Defendant asserts that this exception "has been uniformly interpreted as limited

to the right to serve process," but that is not what the statute says, and defendant offers no support for his unlikely interpretation. Nor is there any evidence that Congress declined the terms of California's partial cession of jurisdiction. (See *S. R. A., Inc. v. Minnesota* (1946) 327 U.S. 558, 563.) As particularly relevant here, only a few years later Congress explicitly recognized the states' authority to reserve jurisdiction over national forest lands: In Title 16 United States Code section 480, enacted in 1897, Congress provided that the states' jurisdiction "over persons within national forests shall not be affected or changed by reason" of the creation of national forests. "By this enactment Congress in effect . . . *declined* to accept exclusive legislative jurisdiction over forest reserve lands . . . ." (*Wilson v. Cook* (1946) 327 U.S. 474, 487, italics added.)

In sum, although California ceded the lands comprising the Los Padres National Forest to the United States, California also retained jurisdiction to administer its criminal laws on the ceded lands. Defendant points to nothing in the history of the Los Padres National Forest to suggest it was an exception to this reservation of criminal jurisdiction. The superior court did not err in exercising jurisdiction in this matter.

## B.     Jury Selection Claims

### 1.     *Adequacy of Voir Dire*

Defendant argues the trial court committed several errors that resulted in inadequate voir dire of prospective jurors. Defendant's claims lack merit.

#### a.     *Denial of Request for Sequestered Voir Dire*

Defendant first points to the trial court's decision to deny defendant's request for sequestered voir dire. Before jury

selection began, defendant had filed a motion seeking sequestered voir dire concerning prospective jurors' attitudes toward the death penalty and regarding the extent of pretrial publicity. Defense counsel argued that sequestration would avoid the potential contamination of prospective jurors who might learn what others had seen or heard in the media. Defense counsel also argued sequestered voir dire was necessary to determine prospective jurors' attitudes toward the death penalty "alone, separately," and "face-to-face" with counsel. The prosecution opposed the motion on the ground that sequestration was unnecessary; jurors' attitudes and exposure to pretrial publicity could be explored through juror questionnaires. The trial court denied the motion, agreeing with the prosecution that juror questionnaires would adequately respond to defendant's concerns.

Although defendant now asserts that the trial court erred in denying the motion, he offers no substantive argument to support the claim and has therefore forfeited it. But even if the claim were properly presented for review, we would find no error. " '[I]n reviewing a trial court's denial of a defendant's motion for individual sequestered jury selection, we apply the "abuse of discretion standard," under which the pertinent inquiry is whether the court's ruling "falls outside the bounds of reason." ' " (*People v. Perez* (2018) 4 Cal.5th 421, 443, quoting *People v. Famalaro* (2011) 52 Cal.4th 1, 34.) We remain mindful that " '[i]ndividual sequestered jury selection is not constitutionally required, and jury selection is to take place "where practicable . . . in the presence of the other jurors in all criminal cases, including death penalty cases." ' " (*Perez*, at p. 443, quoting Code Civ. Proc., § 223.) Here, defendant has not shown that group voir dire was impracticable. He sought

sequestered voir dire because of concerns about potential juror bias, but he has not shown that group voir dire resulted in any actual juror bias. (Cf. *People v. Vieira* (2005) 35 Cal.4th 264, 288 ["group voir dire may be determined to be impracticable when, in a given case, it is shown to result in actual, rather than merely potential, bias"].) The trial court acted within its discretion in concluding defendant's concerns could be adequately addressed by means other than individual sequestered voir dire.

### b. Exclusion of Questions from Juror Questionnaire

Defendant next complains that the trial court erred in excluding certain questions from the juror questionnaire. The parties exchanged proposed juror questionnaires in early October 2001. The trial court warned the defense that its proposed questionnaire, which was twice as long as the prosecution's, ran the risk of alienating prospective jurors. The court explained that the questionnaire "looks pretty formidable . . . and the [jurors] may get in a hurry to finish, and you don't really get the kind of answers you want; whereas, if they see they've got a more limited question[naire] then they've got some time." The parties eventually settled on a questionnaire, which was provided to four panels of prospective jurors. Before distribution, a number of questions, including four that had been proposed by the defense to examine jurors' attitudes toward an intentional kidnap murder of a minor (proposed questions 78, 79, 98, and 120), were excluded from the questionnaire.

Excluded question number 78 inquired, "What was your first reaction when you heard this was a 'kidnapping murder' case?" Question number 79 inquired whether a prospective

juror's "feelings about the issue of kidnapping and murder [were] such that" the juror "could not be fair and impartial in relation to the defendant" or "to [a] complaining witness," or alternatively if "[n]either statement applie[d]." Question number 98 inquired, "During the course of the trial, the prosecution may present evidence that includes pictures of Mr. Markowitz after he died, and a gun that was used in the killing. The prosecution may even display the gun itself. How do you think this type of evidence would affect your judgment of the case as a whole?" Question number 120 inquired, "During this trial you may hear detailed descriptions of kidnapping and murder. Would that effect [*sic*] your ability to be fair and impartial?" followed by a short blank line. The question continued, "If so, please explain."

Defendant argues it was error to exclude these questions. Without the ability to question jurors about their attitudes toward the death penalty in a case involving the intentional kidnap murder of a minor, he argues, the defense had no adequate means of determining whether the jurors harbored disqualifying biases concerning the commission of such a crime. We disagree.

A trial court has " 'wide latitude' " in the conduct of voir dire, including with respect to the questions to be asked and their format. (*People v. Landry* (2016) 2 Cal.5th 52, 83; see Code Civ. Proc., § 223.) Voir dire must be " ' " 'reasonably sufficient to test the jury for bias or partiality.' " ' " (*Landry*, at p. 83.) But "[i]t is not the purpose of voir dire to ' "educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law." ' " (*Ibid.*)

Here, although defendant suggests otherwise, the prospective jurors were informed of the nature of defendant's alleged crime. Before adjourning for one week on October 17, 2001, the court briefly described the case to the prospective jurors. The court explained that the crime involved "the alleged kidnapping of the 15 year old Nicholas Markowitz, and resulted, allegedly, in the killing of Mr. Markowitz." The court explained that the series of events at issue occurred over a period of four days and that defendant was charged with kidnapping, first degree murder, and a special circumstance allegation that the murder occurred during the commission of a kidnapping. The juror questionnaire then sought to evaluate prospective jurors' attitudes toward the death penalty in such a case, by asking jurors whether they would always vote guilty as to first degree murder and true as to the special circumstance, so as to guarantee a penalty phase, and whether jurors would automatically vote for death.

The additional questions on the subject proposed by defendant—which asked, for example, for the jurors' "first reaction" to hearing "this is a 'kidnapping murder case' "—were not well-tailored to meaningful further exploration of the jurors' views on the death penalty in this context. And to the extent defendant sought the jurors' predictions about how their judgment would be affected by "detailed account[s]" of the crime or other prosecution evidence, it is well established that a defendant has "no right to ask specific questions that invite[] prospective jurors to prejudge the penalty issue . . . [or] to educate the jury as to the facts of the case." (*People v. Burgener* (2003) 29 Cal.4th 833, 865, citations omitted.)

### c.   Conduct of Voir Dire

Defendant next argues that voir dire was inadequate because the questioning was insufficient to determine whether any of the jurors held disqualifying views concerning the automatic application of the death penalty for the intentional kidnap murder of a minor. Defendant argues: "Six jurors, fully half the panel, were not questioned at all except [as to] whether they could volunteer a basis for their own disqualification." Defendant contends, "Such general inquiries are insufficient under long-standing United States Supreme Court case law." (See *Morgan v. Illinois* (1992) 504 U.S. 719, 734–735.) In *Morgan*, the high court held that the petitioner "was entitled, upon his request, to inquiry discerning those jurors who . . . had predetermined . . . whether to impose the death penalty." (*Id.* at p. 736.)

As an initial matter, defendant's claim that these six jurors were not questioned "at all" is inaccurate. The court questioned these jurors with some care and permitted the parties to do the same. To the extent defendant took issue with the nature of the trial court's questioning, he made no mention of it before the court. It is now too late to complain that the court's questioning was inadequate. (*People v. Salazar* (2016) 63 Cal.4th 214, 236 ["We have held that 'a defendant may not challenge on appeal alleged shortcomings in the trial court's voir dire of the prospective jurors when the defendant, having had the opportunity to alert the trial court to the supposed problem, failed to do so.' "].)

Defendant contends that the questioning of four individual jurors raised "particular concerns about impartiality" that were not adequately explored in voir dire because the trial court impermissibly restricted questioning. But contrary to

defendant's contention, the trial court's decision to remove the four defense-proposed questions from the juror questionnaire is not reasonably interpreted as precluding counsel from asking follow-up questions regarding prospective jurors' attitudes toward the death penalty in a kidnap-murder case. It appears from the record that the defense could have asked additional questions of the prospective jurors but did not do so.

Nor, in any event, does the record support defendant's assertion that the prospective jurors' answers raised particular concerns about impartiality that were not adequately explored in voir dire. Defendant asserts that Juror No. 9184's questionnaire suggests she was biased against defendant because she responded affirmatively to the question, "Do you have any feelings against the defendant solely because the defendant is charged with this particular offense?" She also responded affirmatively to the question inquiring whether "the mere fact that an information was filed against the defendant cause[d her] to conclude that the defendant is more likely to be guilty than not guilty." But during voir dire, defense counsel asked her to explain these responses. She indicated that she initially made a "natural" or "snap judgment" but after "sitting here for a while, [she] believe[d] that there's a due process that people should go through now, and [she] underst[ood] a little bit more about the situation." Defense counsel probed further whether she meant that her position on these two questions had "changed somewhat" in that she "now . . . realize[d] that just because someone is charged with an offense, or [had] been arrested for an offense that isn't evidence of anything." Juror No. 9184 agreed with defense counsel that she had "changed [her] feelings somewhat on that." Juror No. 9184 also confirmed to the trial court that she had "no reason to think" she could not

31

give both sides a fair trial, that she was prepared to follow the law, and that she would accord defendant the presumption of innocence.

Defendant argues that Juror No. 8919's questionnaire responses raised particular concerns because Juror No. 8919 "[d]isagree[d] somewhat" with the statement, " 'Anyone who intentionally kills another person should always get the death penalty.' " Juror No. 8919 added that "self defense can be seen as 'intentional.' " Juror No. 8919 also "[d]isagree[d] somewhat" with the statement, " 'Anyone who intentionally kills another person should never get the death penalty,' " adding, "should vs. shall." Taken together, these responses do not indicate, as defendant argues, that Juror No. 8919 would vote for the death penalty for all intentional murders other than self-defense. Nor did voir dire raise such concerns; on the contrary, the juror responded affirmatively to questions as to whether he could deal "fairly and impartially" with the question of penalty.

Defendant similarly argues that Juror No. 0555's questionnaire responses raised concerns because she indicated she "[a]gree[d] somewhat" with the statement, "Anyone who intentionally kills another person should always get the death penalty" and "[s]trongly disagree[d]" with the statement, "Anyone who intentionally kills another person should never get the death penalty." But Juror No. 0555 also stated she would consider both possible penalties if the case reached the penalty phase and that she would vote for life imprisonment in an appropriate case. Defendant elected not to question Juror No. 0555 on these subjects, and he points to nothing in her voir dire responses to indicate that the juror would not be impartial.

Finally, defendant asserts that Juror No. 6619 raised particular concerns because, among other things, she wrote in her juror questionnaire that, philosophically, she was strongly in favor of the death penalty and "agreed somewhat" that anyone who kills intentionally should always receive the death penalty. But Juror No. 6619 also said she was amenable to either punishment, depending on the evidence, and affirmed that she would vote for life imprisonment in an appropriate case. During voir dire, defense counsel probed some of Juror No. 6619's responses concerning her views on the death penalty. Although Juror No. 6619 had initially offered "self-defense" and "automobile accidents" as examples of intentional killings where the death penalty would not be warranted, counsel then clarified that the question was whether there would be a situation in which the juror could envision reaching the penalty phase of a trial, after finding defendant "guilty of first-degree murder," and determining "life imprisonment without parole to be the most appropriate sentence." Juror No. 6619 responded affirmatively, at which point defense counsel passed for cause, thereby waiving any claim of juror bias. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 59.) To the extent defendant now argues voir dire was inadequate to determine whether Juror No. 6619 was capable of serving as an impartial juror, we see no merit to the claim.

## 2. *Excluding Prospective Juror F.G. for Cause*

Defendant contends the trial court erred by excluding Prospective Juror F.G. for cause. We hold the court acted within its discretion.

F.G. was a musician who had performed at many prisons and who had also worked on antidrug programs with the health

department and the county sheriff's department. During voir dire, the trial court asked F.G. whether any of these experiences would preclude him from being a fair juror, "knowing what the juror's job is." F.G. replied, "No, I don't think so. The only caveat I would put on that is that I have . . . witnessed firsthand the results of the sentencing. And I have spoken with people who have been, for instance, sentenced for life, with no chance of parole and stuff like that. And that—it's a very heavy burden to judge someone. So that's all I can say." The trial court explained to F.G. that the concept of punishment and penalty had no place in the determination of a defendant's guilt and asked whether F.G. understood those distinctions. F.G. indicated his assent.

The court inquired whether, in light of F.G.'s experience working with people who had received life sentences, he "would be inclined to consider the potential sentence in determining the issue of guilt or innocence" and whether those experiences "would influence [his] view of the facts." F.G. replied that he "would like to think it wouldn't, but it hangs on me very heavily, morally." The court clarified that "the question is, if you wind up on this jury, are you going to deliberate with the other jurors, consider the facts, decide the facts based on the evidence, without consideration of any potential sentence that may be imposed, if you get to that phase of the case. That's the question." F.G. responded, "I would have to say that no matter what I did, that would be a factor." The court excused the prospective juror.

Criminal defendants are constitutionally entitled to a trial before an impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; see *Duncan v. Louisiana* (1968) 391 U.S. 145, 149–150; see also *Turner v. Louisiana* (1965) 379 U.S. 466, 471;

34

*People v. Black* (2014) 58 Cal.4th 912, 916.) But the state also has a vital interest in ensuring cases are tried before juries able to make decisions concerning punishment "within the framework state law prescribes." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.) "[I]n determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." (*Ibid.*) "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 10.) A trial court has the power, though not the obligation, to excuse biased prospective jurors on its own motion. (*People v. Cunningham* (2001) 25 Cal.4th 926, 981 [upholding sua sponte excusal of a prospective juror for cause]; *People v. Bolin* (1998) 18 Cal.4th 297, 315–316 [no duty to excuse on court's own motion].)

Although this was a capital trial, here it was F.G.'s views toward a life sentence, not the death penalty, that raised concerns about his ability to serve as a juror. The court engaged in a colloquy with F.G., probing his responses to questions suggesting an inability to put aside considerations of punishment in determining guilt. F.G. unequivocally explained that the potential penalty of life imprisonment "would be a factor" in determining guilt. The trial court concluded F.G. would be unable to follow the trial court's instructions and evaluate the evidence of defendant's guilt without considering the potential penalty, and for that reason determined dismissal was warranted. Substantial evidence supports the trial court's determination. (*People v. Duenas, supra,* 55 Cal.4th at p. 10.)

Defendant raises several challenges to this conclusion, but none is persuasive. First, defendant argues it was improper for the trial court to excuse F.G. absent a request from one of the parties. Our cases, however, do not forbid a trial court from excusing a juror for cause on its own motion (see *People v. Cunningham*, *supra*, 25 Cal.4th at p. 981), and defendant offers no persuasive reason for us to create such a bar.

Defendant next argues the excusal was improper under *Adams v. Texas* (1980) 448 U.S. 38, which held that the federal Constitution prohibits the exclusion for cause of a potential juror because he or she is unable to state under oath that the mandatory sentence of death or life imprisonment " 'will not affect his [or her] deliberations on any issue of fact.' " (*Id.* at p. 42, quoting Tex. Pen. Code Ann. § 12.31.) The court explained the effect of the requirement was to exclude from the jury pool those who stated "they would be 'affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally." (*Adams*, at pp. 49–50.)

This case presents no comparable circumstances. Although defendant argues otherwise, in this case the trial court reasonably understood F.G. to say not merely that his prior experiences and views would cause him to perform his duties as a juror with a particular sense of seriousness and gravity, but that they would undermine his ability to impartially evaluate the evidence of defendant's guilt. *Adams* does not bar the excusal of such a juror. (See *People v. Ashmus* (1991) 54 Cal.3d 932, 963 [*Adams* does not forbid excusal of juror who admitted that his views on the death penalty would cause him to apply a standard of proof higher than proof beyond a reasonable doubt].)

Defendant also attempts to analogize this case to *People v. Heard* (2003) 31 Cal.4th 946, in which we held that a prospective juror was dismissed without adequate basis after assuring the court he would be able to follow the law. (*Id.* at p. 964.) The analogy is inapt; here, F.G.'s responses to voir dire indicated he would be unable to perform the duties of a juror insofar as he informed the court he could not follow the court's instructions to determine guilt without taking into account the possible penalty. Substantial evidence supports the trial court's dismissal, and we are presented with no reason to upset that decision on appeal. (*People v. Duenas, supra,* 55 Cal.4th at p. 10.) [6]

### C. Guilt Phase Claims

#### 1. *"Second Kidnap" Theory*

Defendant contends there was a material variance between the kidnap alleged in the indictment and the prosecutor's argument regarding his actual offense, rendering him unable to defend against the charge in violation of his rights

---

[6] At oral argument, defense counsel also contended Prospective Juror F.G.'s responses to the questionnaire indicated his willingness to follow the court's instructions in general. He contended that dismissal was not warranted because, in their oral exchange, the court did not specifically advise F.G. that the court's instructions would include an instruction to decide guilt based on the evidence presented, without allowing the potential penalty to factor into the jurors' evaluation of the facts of the case. Based on our review of the record, we see no genuine potential for confusion on this point. It was not necessary for the trial court to explicitly advise F.G. that a juror's determination of the facts should be based solely on the evidence presented.

under the Fifth and Sixth Amendments to the United States Constitution. We reject the argument.

### a. Background

Defendant, along with Skidmore, Rugge, Pressley, and Hollywood, was charged by indictment with kidnapping for purposes of ransom or extortion. Specifically, the charging document stated that "[o]n or about August 6, 2000 through August 9, 2000, in the county of Santa Barbara, the said defendants . . . did willfully, unlawfully, and forcibly detain, take, carry away, and kidnap NICHOLAS SAMUEL MARKOWITZ, age 15, for purposes of ransom or to commit extortion, or to extract money from another person, in violation of Penal Code section 209(a)." Five special allegations were charged along with the kidnapping count, including that the victim suffered death in the course of the kidnapping and that defendant intentionally discharged a firearm resulting in Nick's death.[7]

During his closing argument, defense counsel maintained that defendant had taken no part in the charged kidnapping, because that kidnap, which began on August 6, had ended before defendant drove to Santa Barbara. Specifically, counsel argued that the kidnap ended when the victim could have fled his captors—but did not—at several points during his captivity. "[T]his kidnapping . . . ended before Mr. Hoyt ever spoke with Jesse Hollywood on the 8th [of August, 2000] to take a bag up to Santa Barbara. The kidnapping was done." In response, the

---

[7] Of the three remaining special allegations, two related to Pressley's age and the last stated that Skidmore, Rugge, Pressley, and Hollywood were principals in a felony in which a coprincipal, defendant, possessed an assault weapon.

prosecutor argued that even if the defense was correct that the kidnap concluded when Nick could have fled, defendant was guilty of kidnap because "independent of the kidnapping that took place on the 6th where [the victim] was brought from Los Angeles County to Santa Barbara, there is as well the kidnapping that took place in the late evening hours of the 8th, into the early morning hours of the 9th of August, where he's taken from the motel, perhaps taken as well to Rugge's house at some point, we'll never know, and then taken up to the location on West Camino Cielo and there he was killed. That we know is an independent kidnapping. And certainly, he would be guilty of that offense."

The prosecutor pointed out before the jury that defense counsel's argument never addressed whether defendant would be guilty of the kidnap based on movement of the victim from the motel to the murder site. Defense counsel objected at this point, noting that only one count of kidnapping was charged. The following colloquy occurred:

"THE COURT: He said the count, the kidnapping for—count, relates only to the incident of the—I'll have to look. Isn't that your point?

"MR. CROUTER [Defense]: That there is only one count charged.

"MR. ZONEN [Prosecution]: Well, you have to look at the date on the pleading there, and the time, and whether or not it governs an entire period of time. And I believe in an Indictment you'll find that it covers the period of time from the 6th through the 9th.

"THE COURT: Let's see. That's the way the count is drawn. August 6th through August 9th.

"MR. ZONEN: See, a kidnapping can go over a period of time, and in this case it did. That kidnapping took place from the 6th through the 9th. It is one count, but it's one count that covers the entirety of his movement from the time he left at the location near his residence in that area, I think near Ingomar and Platt in San Fernando Valley, to the point where he was killed up in Santa Barbara County. That's all covered in the pleading in that one count as a kidnapping."

Defense counsel raised no further argument or objection, and the prosecutor continued his rebuttal.

### b. Discussion

### i. Material Variance

" 'Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them.' " (*People v. Williams* (2013) 56 Cal.4th 630, 681.) Notice is supplied in the first instance by the accusatory pleading. (E.g., *People v. Jones* (1990) 51 Cal.3d 294, 317.) But a variance between the pleading and proof at trial will be disregarded if it is not material. (*People v. LaMarr* (1942) 20 Cal.2d 705, 711.) "The test of the materiality of a variance is whether the indictment or information so fully and correctly informs the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his defense, or placed in danger of being twice put in jeopardy for the same offense." (*Ibid.*; accord, *People v. Maury* (2003) 30 Cal.4th 342, 427–428; *People v. Arras* (1891) 89 Cal. 223, 226.)

Here, the indictment alleged defendant and his codefendants committed an aggravated kidnap (Pen. Code, § 209, subd. (a)) by forcibly abducting Nick on August 6, 2000, and detaining him until he was murdered on August 9, 2000. The jury was instructed on the elements of aggravated kidnap and on the lesser included offense of simple kidnap. The aggravated kidnap statute provides in pertinent part, "Any person who . . . kidnaps or carries away another person by any means whatsoever with intent to hold or detain . . . that person for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony . . . ." (Pen. Code, § 209, subd. (a).) Simple kidnap, in turn, requires proof of three things: "that (1) the defendant took, held, or detained another person by using force or by instilling reasonable fear; (2) using that force or fear, the defendant moved the other person, or made the other person move a substantial distance; and (3) the other person did not consent to the movement. ([Pen. Code,] § 207, subd. (a).)" (*People v. Burney* (2009) 47 Cal.4th 203, 232.)

Defendant argues the prosecution crafted a new theory of kidnap during the rebuttal phase of closing argument for the dual purposes of surprise and to have the last word. This new theory was that there were two distinct kidnap offenses in this case, the first one commencing on August 6, 2000, and the second on August 8, 2000. Defendant argues that because he was charged with a single kidnap offense in the indictment, the "second" kidnap constitutes a material variance from the charged offense in violation of his Fifth and Sixth Amendment rights.

The argument lacks merit. As the prosecution correctly explained in the trial court, the indictment charged defendant

and his codefendants with a continuing kidnapping offense that extended over a period of time. That period included the time the victim left his home and was taken to Santa Barbara, the time he spent in Santa Barbara, and the time he was taken from locations within Santa Barbara to the site of his murder. True, defense counsel theorized that the kidnapping was interrupted by a period during which Nick could have eluded his captors at some point before defendant became involved on August 8, 2000. But the indictment put defendant on notice that the prosecution intended to prove kidnapping based on the events of August 8 and 9, 2000, as well. Defendant could not have been misled by his own "interruption" theory into believing otherwise. There was no fatal variance between indictment and proof, and cases finding fatal variances under dissimilar circumstances do not help defendant's case. (Cf. *U.S. v. Adamson* (9th Cir. 2002) 291 F.3d 606, 615–616; *U.S. v. Tsinhnahijinnie* (9th Cir. 1997) 112 F.3d 988, 990.)

### ii. Alleged Hearsay

A corollary of defendant's "two kidnap" theory is that there were also two distinct conspiracies, the first involving the August 6 to 8 kidnapping of Nick and the second involving a separate and unrelated agreement to kidnap and murder Nick. Under this theory, defendant argues that the trial court erred by admitting various out-of-court statements by Hollywood, Rugge, Skidmore, and Pressley, as testified to by various witnesses at trial, because the statements were not admissible as statements of coconspirators in the only conspiracy and kidnapping defendant participated in, and therefore constituted inadmissible hearsay.

Coconspirators' hearsay statements may be admitted if there is independent evidence of a conspiracy and the party seeking to admit the hearsay shows the speaker was involved in the conspiracy when the hearsay statement was made, the statement was made in furtherance of the conspiracy, and the person against whom the statement is being offered either was participating in, or later would participate in, the conspiracy. (Evid. Code, § 1223; *In re Hardy* (2007) 41 Cal.4th 977, 995–996.) Here, the trial court permitted introduction of hearsay statements testified to by Affronti, Hoeflinger, Carpenter, Adams-Young, Sheehan, and Hogg regarding Nick's time in Santa Barbara. As generally set forth above, these witnesses testified about Nick's kidnap and captivity. Although defendant alleges these statements were not in furtherance of the conspiracy to kidnap Nick, the trial court reasonably concluded otherwise. We find no error.

As an initial matter, it is unclear that defendant has preserved his objections to the introduction of the statements: When the statements in question were introduced, defendant generally failed to object on the bases he now raises on appeal. For example, although he raised a "hearsay upon hearsay" objection at trial to Adams-Young's testimony regarding a statement made by Pressley after she had expressed concern to him about Nick's continued presence in Santa Barbara, defense counsel stated, "And I don't disagree with the . . . in furtherance of the conspiracy" theory of admission, "but I still have the problem that there appears to be a second level of hearsay." The court overruled defendant's objection.

"Because the question whether defendant[] . . . preserved the[] right to raise this issue on appeal is close and difficult, we assume that defendant[] . . . preserved the[] right, and proceed

to the merits." (*People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6.) Having done so, we conclude the trial court committed no error in admitting the hearsay statements recounted by these witnesses. Defendant argues that the conspiracy he entered into with Hollywood to murder Nick was a wholly separate enterprise from the one Rugge and others entered into to kidnap Nick, and the statements admitted regarding Nick's capture were therefore inadmissible with regard to Nick's murder and defendant's involvement therewith. The trial court was not compelled to so finely parse this case. The evidence showed that Hollywood, the mastermind, had his friends kidnap Nick to exact a ransom from Nick's brother. When Hollywood learned that the potential penalty for Nick's kidnap was too high a price for him to pay, he asked defendant to kill Nick. The hearsay statements that were admitted, which tell the story of Nick's initial capture and subsequent captivity, were relevant to demonstrating this overarching conspiracy, and were made in furtherance of the conspiracy.

### *iii. Jury Questions*

Defendant also argues the court's responses to juror inquiries regarding whether one or two kidnaps were alleged, and the relevance of conspiracy, ultimately worked to direct a verdict on the kidnap count and kidnap-murder special-circumstance charges.

During the second day of deliberations, the jury posed a question about whether one or two kidnapping events occurred and asked about the relevance of the conspiracy instruction. The jury asked whether "the kidnapping [is] a continuous, single event" and "what are the correct dates" of the kidnapping. The court explained, "[T]hat was one of the issues in the case that I

gave you an instruction when a kidnapping terminates, and there was some, the defense—there was some argument that the initial kidnapping had already terminated and he was free to go, remember that, and then there was some subsequent argument that the facts supported a second kidnapping based upon what you found there, and so that's really one of the issues that you have to decide. I can't answer that question for you. I can just point out to you that that was one of the disputed issues in the case. One, was the kidnapping that happened in the San Fernando Valley still ongoing when this happened. And there was argument about that. And then, even if it wasn't, was there another kidnapping. Those were the issues that were presented to the jury. And I can only remind you of what those issues were. I can't answer that question for you, because I'd be stepping in and I'd have to send all of you home because I'd be taking over your responsibility." The foreperson responded, "[T]hat's helpful in itself." Defense counsel was present and raised no objection.

The court also responded to the jury's question regarding the dates of the kidnapping offense, noting that the dates the jury had to keep in mind were August 6 and 9, 2000. The court noted, "[A]gain, whether or not the kidnapping was ongoing through that period or there were two kidnappings or there was only one that had terminated, those are the dates that you have to keep in mind, the 6th through the 9th."

The jury also asked about the lesser included offense of simple kidnap under Penal Code section 207. The court reminded the jury to consider defendant's involvement only when considering the elements of the offense. The jury then asked, "So being a coconspirator has nothing to do with it?" The court reminded the jury that defendant was not charged with

conspiracy, and the jury was instructed regarding coconspirators to give context to certain statements made. The jury thanked the court and indicated its question had been resolved.

Defendant argues the trial court's responses were faulty insofar as they instructed the jury they could convict on the basis of the prosecution's "second kidnap" theory; failed to clarify that the jury could not convict defendant of the kidnap if the movement of the victim during this kidnapping was incidental to the murder (*People v. Brents* (2012) 53 Cal.4th 599, 612); and failed to clarify that defendant could not be held "strictly liable" for an earlier kidnap by other participants. To the extent, if any, the court's response caused confusion, defendant's failure to object forfeits any claim of error on appeal. (See *People v. Tully* (2012) 54 Cal.4th 952, 1061.) In any event, there was no significant risk of confusion. The trial court correctly advised the jury it could convict defendant of kidnapping based on his own involvement in the transportation of the victim to the site where he was murdered. Under the circumstances of the case, there was no danger the jury would misunderstand the trial court as advising that it could hold defendant "strictly liable" for the earlier abduction of Nick on August 6; no such argument was raised at trial. Defendant's argument that the trial court's responses worked to direct a verdict on the kidnap count and kidnap-murder special-circumstance charges is without merit.

### *iv.   Instructional Issues*

Defendant argues that a unanimity instruction was warranted or could have cured whatever error the court created through its responses to juror questions. Such instructions

46

"generally appl[y] to acts that could have been charged as separate offenses, and . . . must be given ' "only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged." ' " (*People v. Seaton* (2001) 26 Cal.4th 598, 671.) Here, for reasons already explained, there was no realistic possibility of disagreement. The indictment charged a continuous course of conduct—albeit one involving various actors at different times—that began with Nick's abduction on August 6, 2000, and culminated with his murder on August 9, 2000. The evidence at trial showed that defendant's involvement began on August 8 when he took and transported Nick to the location where he was killed. The trial court advised the jury that it was to evaluate only defendant's involvement when determining defendant's guilt. The trial court was not obligated to give a unanimity instruction.

Finally, we note that while defendant argues the jury should have been instructed with CALJIC No. 9.56,[8] setting forth the asportation-by-fraud defense, he neither requested the instruction nor objected to the trial court's failure to give the instruction. The trial court had no sua sponte duty to give the instruction because the instruction was inconsistent with the

---

[8]    CALJIC No. 9.56 provides:  "When one consents to accompany another, there is no kidnapping so long as the condition of consent exists. [¶] To consent, a person must: [¶] 1. Act freely and voluntarily and not under the influence of threats, force, or duress; [¶] 2. Have knowledge that [he] [she] was being physically moved; and  [¶]  3. Possess sufficient mental capacity to make an intelligent choice whether to be physically moved by the other person [or persons]. [¶] [Being passive does not amount to consent.] Consent requires a free will and positive cooperation in act or attitude."

theory of the defense. There was thus no error in connection with this instruction.

### 2. *Admission of Custodial Confession at Trial*

Defendant contends the trial court erred by admitting the audio and videotapes of his custodial confession to killing Nick, which he claims were involuntary and were obtained in violation of his *Miranda* rights. The trial court did not err in admitting defendant's confession.

### a. *Background*

While housed at the Santa Barbara jail, defendant spoke twice with his mother. Evidently believing her son to be innocent and taking the blame for someone else's crime, she suggested he talk to the detectives to "spill [his] guts and get out." Defendant apparently heeded her advice and asked to speak with a detective.

Defendant then spoke with Detective West and Sergeant Reinstadler, who began by confirming that defendant had initiated the conversation and reminding him of his *Miranda* rights. Defendant waived his *Miranda* rights orally and in writing. After conversing back and forth about the crime, Hoyt told the detectives that he had asked to speak with them to "say that this picture that everybody's painting of me is not me." Detective West responded, "Well, tell us who you are. Tell us how this went down." Hoyt told them he could not do that and instead asked, "Do you mind if I go back to my cell and think about tonight and talk to you guys tomorrow because I know my arraignment is Monday?" The detectives responded by telling defendant, "Once you're arraigned, we can't talk to you. That's the bottom line. I mean, if you want to tell us something, I'm

being honest with you, this is your opportunity to do it. This is it." Defendant replied, "There's no way I can talk to you tomorrow?" Sergeant Reinstadler explained, "No. I know why," continuing, "you won't want to talk to us tomorrow because somebody's gonna get to you, telling you not to talk to us."

When the detectives asked if he was okay, defendant responded: "I mean, I'm going down for life." Sergeant Reinstadler replied: "There's a difference between life and the death penalty. And everything else in between. All we want is the truth." The interview continued, and after additional discussion, defendant explained how he had become involved in the crimes. Defendant explained to the detectives he was indebted to Hollywood and was told by an intermediary (whom defendant did not name) that he could erase his debt if he went to "take care of somebody," which defendant understood to mean killing him. The intermediary did not tell defendant the name of his intended victim but relayed a location—Santa Barbara. Defendant drove Sheehan's car to the Lemon Tree Inn in Santa Barbara, where he found a gun waiting.

When the detectives asked what happened next, defendant said, "I think I'm going to stop there for now," and asked for a glass of water. The detectives complied with the request for water and asked defendant whether he was asking to take a break or "telling us you don't want to talk anymore, period." Defendant replied that he would like an overnight break. The detectives responded that that would be "[t]oo late," and told defendant that "[o]nce a lawyer contacts you, we are precluded from speaking with you anymore, period." Defendant asked whether a lawyer would be contacting him the next day, and the detectives replied, "Oh, I'm sure. It's normal. It's their job." Defendant told the detectives his mom was unable to afford

49

an attorney for him, so he would have to work with a public defender. While the detectives assured him "[t]hat's fine," defendant worried aloud, "[A] public defender, I'm going nowhere with that one." The detectives then reminded defendant, "You wanted to talk to us, man." Defendant responded, "And have I helped you out at all?" The detectives told him that there were still pieces of the puzzle to fill in, and the conversation continued.

Defendant admitted to feeling sorry for "[t]hat kid that I buried." He told the detectives he had not put the duct tape on Nick's mouth. When the detectives said Rugge had told them otherwise, defendant responded: "I love this one. The only thing I did was kill him."

After answering additional questions about Pressley's involvement, defendant said: "All right. You guys I think I want to stop there. I think you guys got a pretty good picture." Detective West agreed: "Yeah, I've got a good picture, and it's pretty grim for you . . . . I'm sorry, uh, that that's what you painted for me." Sergeant Reinstadler asked defendant whether there was "ever a time when right before you pulled the trigger that you just thought, you know, I shouldn't do this? This is wrong." Defendant replied: "Hell, yes. Right before." The conversation ended not long thereafter.

Before trial, defendant sought to suppress the confession, arguing that it was coerced and obtained in violation of *Miranda*. Defense counsel argued that Sergeant Reinstadler and Detective West threatened defendant with the death penalty and urged him to correct the impression that he was a "stone-cold killer." The trial court concluded the confession was not coerced, explaining the detectives' reference to the death

penalty "was actually in response to the defendant's initiation of the subject of penalty. He said something about the fact that he was looking at life and then the detective said, 'Well, that's better than death or what's in-between,' or something like that, this was not a subject that was pursued after that. And it doesn't appear to me that that reference was anything that resulted or led to Mr. Hoyt's confession."

The trial court also examined whether defendant's admission was coerced because he was called "a stone-cold killer" during the interrogation. The court reasoned that use of that phrase, "in and of itself" was not sufficient to conclude his admission was coercively obtained. The court acknowledged the argument's logic: that if a person is truly a killer, that person would receive the death penalty and would be required to demonstrate facts in mitigation in order to avoid that consequence. The court did not find the detectives' use of the phrase "stone-cold killer" to have been used as a threat. Rather, the court concluded, it was somewhat factual and therefore was not coercive.

The superior court next examined defendant's invocation of his right to remain silent, concluding that the transcript as a whole reflected defendant's desire to continue talking. The court explained that defendant "was not expressing a wish to terminate the interview, to terminate his colloquy with the police, he was temporizing it. He didn't quite know what he wanted to do, and he was sort of postponing the inevitable, but he didn't really want to stop talking *because he didn't quit talking*." (Italics added.) The court continued, "I don't think the officers ever tried to coerce [defendant] into further discussions. I don't think they attempted to question him until after it was obvious that he wanted to resume the discussion. So, I don't find

that there's been any violation of *Miranda* as far as [defendant] is concerned."

The court concluded that defendant's statement to the detectives was admissible because he did not "ever vent[] any real interest in terminating [his] interview." The court noted that when defendant sought an overnight break, the detectives correctly informed him that he would be provided with an attorney, and that attorney might advise him not to continue speaking to the detectives. Because defendant continued talking despite having a basis to cease doing so and because nothing the detectives told defendant was misleading, the court concluded defendant's *Miranda* rights were not violated. Later in the colloquy, the parties acknowledge that defendant says, "Yeah, I think I want to stop there, I think you guys got a pretty good picture." The court did not explicitly rule on whether any statement made following defendant's invocation was admissible because the prosecution agreed to terminate the tape at that point, and the court acknowledged this evidence, the so-called "Side-B" evidence, was not going to be admitted unless defendant elected to testify, which had not yet been determined at the time the court evaluated this statement. Accordingly, the trial court did not expressly rule on whether the statement that followed this third invocation was admissible under *Miranda.*

### b. *Discussion*

The Fifth Amendment provides, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." (U.S. Const., 5th Amend.) "To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of custodial interrogation (*Miranda*, *supra*, 384 U.S. at p. 467), the high court adopted a

set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation (*id.* at pp. 444–445).” (*People v. Jackson* (2016) 1 Cal.5th 269, 338–339.) During such an interrogation, if a defendant invokes either the right to remain silent or the right to counsel, “ ‘ “the interrogation must cease.” ’ ” (*Id.* at p. 339.) “ ‘[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.’ (*Edwards v. Arizona* (1981) 451 U.S. 477, 484–485.” (*Jackson*, at p. 339.) “[W]hen, as in this case, a defendant has waived his *Miranda* rights and agreed to talk with police, any *subsequent* invocation of the right to counsel or the right to remain silent must be unequivocal and unambiguous.” (*People v. Sanchez* (2019) 7 Cal.5th 14, 49 (*Sanchez*).)

“An involuntary confession may not be introduced into evidence at trial.” (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).) It is the prosecution’s burden to establish by a preponderance of the evidence that the defendant’s confession was voluntary. (*Ibid.*) “In determining whether a confession is involuntary, we consider the totality of the circumstances to see if a defendant’s choice to confess was not ‘ “ ‘ “essentially free” ’ ” ’ because his will was overborne by the coercive practices of his interrogator.” (*People v. Spencer* (2018) 5 Cal.5th 642, 672.) A “confession [is] not ‘essentially free’ when a suspect’s confinement was physically oppressive, invocations of his or her *Miranda* rights were flagrantly ignored, or the suspect’s mental state was visibly compromised.” (*Ibid.*)

A confession obtained in violation of *Edwards* and *Miranda* is likewise inadmissible during the prosecution's case-in-chief. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1204–1205.) It is the prosecution's burden to establish by a preponderance of the evidence that the defendant's waiver of his *Miranda* rights was knowing, voluntary, and intelligent. (*People v. Jackson*, *supra*, 1 Cal.5th at p. 339.) In reviewing a trial court's denial of a suppression motion, we accept its resolution of factual disputes when supported by substantial evidence and determine independently whether, on those facts, a challenged statement was obtained illegally. (*Ibid.*)

Defendant raises several challenges to the admission of his confession to the detectives. Preliminarily, he argues that the trial court erred by failing to hold an evidentiary hearing before denying his motion to suppress his confession. Defendant concedes the trial court asked if he wanted such a hearing and he declined. The trial court accordingly decided the suppression issue based on the transcripts and tapes the parties had submitted to the court. We find no abuse of discretion on this score.

Defendant argues that his confession is inadmissible under *Edwards v. Arizona, supra*, 451 U.S. 477, because he requested counsel on arrest and did not voluntarily initiate further contact with the detectives. The record is to the contrary: It shows defendant did initiate further contact by requesting an audience with Detective West and Sergeant Reinstadler, who then renewed *Miranda* warnings before proceeding with the interview. Indeed, West reminded defendant before the interview began in earnest that defendant had initially asked to speak with an attorney and confirmed that

he now wanted to make a statement to law enforcement. Defendant said he did.

Defendant claims, however, that police coerced him into reinitiating contact through the medium of his mother, who had cajoled him over the phone to talk to detectives to secure his release. This claim is utterly devoid of merit. Defendant points to no evidence suggesting that the police had anything to do with the conversation with defendant's mother, except insofar as they facilitated the conversation by allowing defendant to make a collect call. There is nothing coercive about allowing a detained suspect to call his mother.

Defendant also contends he did not act knowingly, intelligently, and voluntarily when he waived his *Miranda* and *Edwards* rights, due to substantial memory deficits as well as his limited experience, education, young age, and below average intelligence. Defendant did not present any evidence of mental or other impairments at the suppression hearing, so he cannot now claim the trial court erred in failing to consider them. And defendant points to nothing else in the record, including his age (21 at the time of the interview), that would have raised questions about his ability to understand his rights as they had been explained to him. The state satisfied its burden of demonstrating by a preponderance of the evidence that defendant's waiver was knowing, intelligent, and voluntary. (See *People v. Nelson* (2012) 53 Cal.4th 367, 375; *People v. Williams* (2010) 49 Cal.4th 405, 425, 428.)

Defendant contends that even if he voluntarily reinitiated contact with the detectives and waived his *Miranda* rights, the detectives later improperly failed to honor his requests to cut off questioning. Defendant points to two episodes in particular.

The first episode occurred when defendant asked detectives: "Do you mind if I go back to my cell and think about tonight and talk to you guys tomorrow . . . ." Defendant contends that at this point, detectives should have stopped questioning him. But after a suspect has waived his *Miranda* rights, officers are not required to cease questioning unless the suspect invokes his rights unambiguously and unequivocally. (*Sanchez, supra*, 7 Cal.5th at p. 49.) Defendant's question did not amount to an unambiguous and unequivocal invocation of the right to cut off questioning. Nor did the colloquy that followed. Sergeant Reinstadler told defendant that once he was "arraigned, we can't talk to you. That's the bottom line. I mean, if you want to tell us something, I'm being honest with you, this is your opportunity to do it. This is it." Defendant reiterated his request to speak with the detectives the next day and was told "No. I know why. [¶] [Y]ou won't want to talk to us tomorrow because somebody's going to get to you, telling you not to talk to us. Play the games that we know people play. And then, the next thing you know, you're looking at you being triggerman." Defendant asked clarifying questions of the detectives about whether he could speak to them with anonymity, and they answered his questions. The conversation continued from there. Because defendant never unambiguously invoked his right to stop the interview, the detectives were under no obligation to do so.

Defendant invokes *People v. Neal* (2003) 31 Cal.4th 63 in support of his argument, but that case is easily distinguished. There, the defendant repeatedly and clearly invoked his rights to silence and counsel without waiving his rights under *Miranda*, only to be ignored by the questioning officer, who hoped to obtain evidence for impeachment purposes. (*Id.* at

p. 74.) Here, by contrast, defendant voluntarily waived his *Miranda* rights at the outset of the conversation and did not unambiguously invoke his right to stop the interview.

The second episode occurred after defendant had spoken to the detectives for some time about how he had learned he could erase his debt to Hollywood in exchange for traveling to Santa Barbara to kill a person unknown to him. When the detectives asked defendant what happened next, defendant said, "You guys know what happened. I think I'm going to stop there for now. Can I get some more water, please?" Defendant argues that even if the detectives were not obligated to stop before, they were obligated to stop questioning him at this point. But once again, defendant never unambiguously invoked his right to silence. The detectives accommodated his request for water, and defendant told them a number of things: He thought the quality of water he had been given was poor; he described the love he had for his eight-year-old brother; he discussed his mother and her dependency upon him, his incarcerated brother, and his drug-addicted sister, all to justify his hesitancy to add to the story he had thus far provided to the detectives regarding the crime. Sergeant Reinstadler reminded defendant about his right to remain silent. Detective West offered to let defendant "collect [his] thoughts," and then, to clarify defendant's meaning, asked whether defendant wanted only a short break or to cut off the conversation altogether. Defendant asked for a cigarette, saying, "I'd love just to take a break. Do some more thinking." The detectives and defendant discussed whether defendant wanted a break overnight or just for a few moments, and defendant indicated the break he had in mind would be overnight.

Sergeant Reinstadler told defendant a break between "now and tomorrow" would be "too late" because "[o]nce the lawyer contacts you, we are precluded from speaking with you anymore, period." Defendant asked whether a lawyer would contact him the next day, and the detective explained it was "normal" and "their job" to do so. Defendant then asked the detectives whether he had been helpful to them, and Reinstadler explained that defendant had an opportunity to be of more help, to fill in more "pieces of the puzzle." The conversation continued. At no time did defendant unambiguously signal a desire to end the interview, even though the detectives gave him ample opportunity to do so.

Defendant contends that the detectives improperly coerced him into continuing the conversation when they told him they would be "precluded" from talking to him again if he chose to take a break until the next day. Defendant contends that the detectives' statements were deceptive and that their deception undermined the voluntariness of his statements. "While the use of deception or communication of false information to a suspect does not alone render a resulting statement involuntary [citation], such deception is a factor which weighs against a finding of voluntariness." (*People v. Hogan* (1982) 31 Cal.3d 815, 840–841.) Here, it was certainly an exaggeration for the detectives to tell defendant they would not be able to speak with him again, "period," if he took a break and spoke with a lawyer; represented suspects can, of course, speak with law enforcement officials if they choose. It is unclear whether the detectives intended to deceive defendant on this point; what the detectives may have meant to convey is that a lawyer would likely advise against speaking with detectives— meaning that, from their perspective, they almost certainly

would not have another opportunity to speak with defendant. But in any event, insofar as they spoke in absolutes, the detectives overstated the case. Regardless, we are not persuaded the statements rendered defendant's statement involuntary. Just before the challenged exchange, the detectives had reminded defendant that he had the right to remain silent and the right to speak with a lawyer. Defendant responded to the exchange by asking for clarification about when a lawyer would contact him, then went on to ask whether he had been helpful to the detectives, and the conversation continued from there. The record does not support defendant's claim that he was coerced into continuing to speak with detectives after he had asked for a break.

Defendant next contends the detectives employed other coercive interrogation tactics that rendered his confession involuntary. (See *People v. Jackson*, *supra*, 1 Cal.5th at p. 340 [" ' "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." ' "].) In particular, he argues that Detective West and Sergeant Reinstadler impliedly threatened him by mentioning the death penalty and that they improperly induced his confession by exaggerating the evidence against him.

" 'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." ' " (*People v. Williams*, *supra*, 49 Cal.4th at p. 436.) As the trial court found, there was nothing coercive about the detectives' brief—and accurate—acknowledgment that the death penalty was a potential punishment for the crimes with which defendant

was charged, and it does not appear that the mention of the death penalty prompted defendant's confession. Nor is urging a defendant to tell his story before matters go any further an impermissible law enforcement tactic. (*Id.* at pp. 438–439, 443; *Carrington, supra*, 47 Cal.4th at p. 171.)

As for defendant's claim that the detectives improperly exaggerated the strength of the evidence against him, defendant points to an exchange in which detectives said others had told them that defendant gagged and shot the victim and dug the grave, which caused defendant to blurt out, "[T]he only thing I did was kill him." As defendant acknowledges, however, "the use of deceptive comments does not necessarily render a statement involuntary. Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is ' " 'of a type reasonably likely to procure an untrue statement.' " ' " (*People v. Williams, supra*, 49 Cal.4th at p. 443.) Defendant fails to explain why, in his view, the detectives' questioning fits that description. The only element of deception in the relevant exchange was the detectives' assertion that others had told them defendant had dug Nick's grave, but defendant fails to explain how the assertion undermined the voluntariness of defendant's claim to have "only" killed Nick.

Defendant's final challenge to the admission of his confession concerns the introduction of the last exchange that took place between the detectives and defendant after defendant told the detectives, "I think I want to stop there. I think you guys got a pretty good picture." In the colloquy that followed, Reinstadler asked defendant if "there ever [was] a time when right before you pulled the trigger that you just thought, you know I shouldn't do this? This is wrong. Because I haven't

heard that from you." Defendant asked if the detectives wanted his "honest[]" response and when they answered in the affirmative, he told them, "Hell, yes. Right before." Defendant now argues that this exchange—what he refers to as "side B"[9] evidence—should have been excluded, or an effective limiting instruction should have been given.

The Attorney General does not dispute that defendant had unequivocally invoked his right to remain silent before this exchange. Nonetheless, we conclude defendant's claim lacks merit. As the high court made clear in *Harris v. New York* (1971) 401 U.S. 222, 225–226, "although statements elicited in violation of *Miranda* are generally not admissible, statements that are otherwise voluntarily made may be used to impeach the defendant's trial testimony." (*People v. Case* (2018) 5 Cal.5th 1, 18.) Defendant argues that the trial court should have excluded the evidence altogether as a sanction for the detectives' deliberate violation of defendant's right to remain silent. But even if defendant's characterization were correct, the "side B" evidence would nevertheless be admissible as impeachment evidence. (*People v. Peevy*, *supra*, 17 Cal.4th at p. 1188; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1076.)

As for defendant's argument about jury instructions, the jury was, in fact, instructed that it was to consider the "side B" evidence only for purposes of impeachment, and not as evidence of guilt. To the extent defendant would have preferred for the instruction be phrased differently to make it more effective, it was his obligation to request a correction of the instruction given

---

[9] This exchange was captured on the second side, or "side B" of the audiotape used to record Detective West's and Sergeant Reinstadler's interview with defendant.

or seek a new, more specific instruction. (*People v. Chism* (2014) 58 Cal.4th 1266, 1308.) Having done neither, defendant has forfeited the claim on appeal. Accordingly, we conclude no error arose from the introduction of the "side B" evidence for impeachment purposes.

### 3. *Defendant's Testimony*

Defendant argues the court violated his rights under the Fifth and Sixth Amendments to the United States Constitution by compelling him to testify as a foundation for testimony by his expert, Dr. Michael Kania, that his confession was false. We conclude his claim is forfeited and lacks merit in any event.

The defense proposed calling Dr. Kania to testify that defendant's confession was false. The trial court held a hearing under Evidence Code section 402 to determine the admissibility of that testimony.[10] During the hearing, the court and parties discussed the possibility of defendant testifying before Dr. Kania to provide a foundation for Dr. Kania's testimony. Specifically, the court indicated its assumption that "defendant is going to testify that he doesn't remember giving that interview" to police to contextualize Dr. Kania's opinion about anxiety causing amnesia of the sort defendant alleges he suffered. The defense did not object at this juncture or indicate

---

[10] Evidence Code section 402, subdivision (a) provides: "When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article." Subdivision (b) provides: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

there was uncertainty about whether or when defendant planned to testify. The court "made it clear that I don't believe that [Dr. Kania] can get on the stand and testify to things that he was told [while interviewing defendant] and, in effect, present the defendant's defense, the defendant's own testimony through the interview, I've said he can't do that." Defendant raised no objection to the court's characterization. The court informed counsel that Dr. Kania's testimony would be limited to his opinion about defendant's anxiety and amnesia, not the content of Dr. Kania's interview with defendant. The court explained, "I'm not going to let him [Dr. Kania] testify as to circumstances, the things that he was told by the defendant. The defendant can testify to those things and he [defendant] can be asked questions about it." The court further rejected defense counsel's argument that Dr. Kania should be permitted to testify as to whether or not defendant gave a false confession, concluding the issue was one for the jury to decide. Defense counsel responded: "We understand your ruling. We object to it on state and federal due process grounds, but we accept it."

Defendant now claims that he testified at trial only because the court compelled him to do so on pain of forfeiting the ability to present Dr. Kania's expert testimony. This compulsion, he argues, violated his Fifth and Sixth Amendment rights. The record does not support the claim. It is true that the trial court observed that an adequate foundation would need to be laid for the expert's testimony. It is also true that the trial court at various times appeared to assume—without contradiction from defense counsel—that defendant would supply the necessary foundation through his testimony. But the trial court did not rule that Dr. Kania's testimony would be permitted if and only if defendant took the stand, nor did

defendant object on the ground that the trial court had, in effect, issued such a ruling. Nor has defendant established it would have been futile to raise such an objection; had he objected, the court could have considered whether, as he now claims, defendant's testimony was in fact unnecessary to lay the foundation for Dr. Kania's opinion. By failing to object in the trial court, defendant has forfeited the claim on appeal.

To the extent defendant argues it was error for the court to make admission of Dr. Kania's testimony contingent on the introduction of foundational evidence, the claim lacks merit. Defendant sought to present expert testimony that he suffered anxiety-induced amnesia and did not recall confessing. But without some foundational evidence that defendant did not remember the confession, Dr. Kania's opinion would lack relevance. Dr. Kania could not be the source of the evidence that defendant did not remember his confession because that information would be the product of inadmissible hearsay, having originated from Dr. Kania's interviews with defendant. (Evid. Code, § 1200.) An adequate foundation was, in fact, required.

Despite defendant's arguments to the contrary, nothing in that conclusion contradicts the high court's teachings in *Crane v. Kentucky* (1986) 476 U.S. 683, 689. In that case, the high court held that when the prosecution's case was based on the defendant's confession, it was error to preclude the defendant from introducing evidence about the manner in which his confession was obtained as part of his defense. (*Id.* at p. 691.) But *Crane* does not require the admission of any and all defense-proffered evidence about the circumstances of a confession, without regard to the ordinary rules of evidence.

Defendant also argues that the trial court violated his constitutional rights by effectively requiring him to testify before Dr. Kania. Defendant relies on *Brooks v. Tennessee* (1972) 406 U.S. 605, in which the United States Supreme Court struck down a Tennessee statute requiring a defendant to testify first or not at all because it deprived "the accused and his lawyer" of the "opportunity to evaluate the actual worth of their evidence" and make tactical decisions after observing the testimony of other defense witnesses. (*Id.* at p. 612.) Here, the trial court placed no comparable restrictions on defendant. The court and parties both appear to have simply assumed that defendant would testify before Dr. Kania, so that Dr. Kania's testimony could be properly contextualized. But defendant never gave any indication that he planned or hoped to testify after Dr. Kania. Because defendant raised no concerns, we conclude this objection is forfeited on appeal. (See, e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 371 (*Bryant*).)

Defendant also claims that the court improperly limited his own direct testimony in a few instances. In some of these instances, review of the record reveals defendant is simply incorrect. For example, he claims he was not permitted to answer whether he would have been willing to go to prison for life in Hollywood's place at the time he was arrested. Although there was an objection, the question was rephrased, and defendant was given an opportunity to, and did, respond. As for the claim that defendant was improperly precluded from explaining what he meant by certain words he used in his confession, there was nothing improper in this ruling. The trial court permitted defendant to testify as to the truthfulness of his incriminating statements, but not what he meant at the time he

said them, since he claimed not to recall having uttered the words in the first place. The trial court did not abuse its discretion by ruling that defendant could not speculate about what he might have meant by words he claimed not to remember saying. (See *People v. Riggs* (2008) 44 Cal.4th 248, 289 [trial court has discretion to determine the relevance of evidence].) Defendant claims the ruling violates *People v. Webb* (1993) 6 Cal.4th 494, 535, in which we said that "a defendant's absolute right to testify cannot be foreclosed or censored based on content." But *Webb* concerns a defendant's right to testify against the advice of counsel, where such testimony will have a deleterious effect necessitating special jury instructions. *Webb* neither holds nor suggests that a testifying defendant is entitled to speculate about matters of which he or she claims no direct knowledge.

### 4. *Expert Witness Testimony*

Defendant argues that the trial court erred by limiting Dr. Kania's and Dr. Glaser's testimony. With regard to Dr. Kania, defendant contends the trial court categorically excluded testimony regarding defendant's statements during certain interviews, which defendant claims was admissible for nonhearsay purposes. He alleges the court erred by prohibiting Dr. Kania from explaining that accepting telephone calls from his mother provoked anxiety in defendant. He also alleges Dr. Kania was prohibited from describing the effects of defendant's personality disorders, his relationship with Hollywood, his sleep deprivation, and drug intoxication on his alleged false confession. Defendant fails to provide any citation to the record for these alleged prohibitions and makes no assertion that he made contemporaneous objections, and we have not located any passage showing that defendant attempted

to offer this testimony but was precluded from so doing. Both by failing to interject contemporaneous objections and by failing to support his appellate arguments with record citations, defendant has forfeited any claim of error on appeal. (See *People v. Tully, supra,* 54 Cal.4th at p. 1061; *People v. Stanley* (1995) 10 Cal.4th 764, 793.) In any event, whatever errors defendant now claims occurred could not have affected the outcome of the case; Dr. Kania testified at length about defendant's alleged anxiety-inducted amnesia based on his evaluation of defendant.

Defendant also claims the trial court erred by permitting Dr. Glaser to testify for the prosecution whether, in his opinion, defendant's claimed amnesia was a fabrication, while "Dr. Kania was not permitted to share his opinion that [defendant's] confession was false in most respects." There is, however, no inconsistency in the court's treatment of the two experts. Dr. Kania was permitted to offer his opinion on precisely the same subject as Dr. Glaser, testifying that he believed defendant's claim of amnesia was credible.

Finally, defendant contends the court erred by denying his request to recall Dr. Kania for purposes of responding to the prosecutor's experts' reports and their testimony. We review for abuse of discretion a trial court's decision to exclude surrebuttal evidence, and we see none here. (*People v. Marshall* (1996) 13 Cal.4th 799, 836.) Defendant does not explain what it was, precisely, about the experts' reports or testimony that required a further response via additional testimony from Dr. Kania, nor did defendant offer such an explanation to the trial court. The claim is therefore forfeited on appeal. Defendant also argues that Dr. Kania should have been permitted to testify in surrebuttal as to the content of defendant's interviews with him in order to respond to the prosecution's evidence that

defendant's claimed amnesia was a fabrication. The trial court did not abuse its discretion in ruling that this was largely territory that had already been covered and did not require additional surrebuttal evidence. If any error occurred, it was not prejudicial. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836–837 (*Watson*).)

## 5.  *Psychiatric Examination*

Defendant argues the trial court erred by compelling him to undergo a prosecution-conducted psychiatric examination. The Attorney General concedes the compelled examination was error but argues it did not prejudice defendant. We agree.

Before trial, the prosecution moved to compel defendant to undergo a psychiatric examination by prosecution experts. In support of the motion, the prosecution argued defendant had placed his mental state at issue by claiming he gave a false confession induced by various psychological factors. The defense objected. After hearing argument, the court granted the motion. The court opined that when "a defendant presents expert psychological or psychiatric evidence" explaining his conduct, "the prosecution is entitled to rebut that evidence, and the only realistic manner in which the prosecution can do that is to be entitled to have a psychiatric evaluation of its own in order to prepare an expert to testify."

The prosecution retained Drs. Glaser and Chidekel, both of whom testified for the prosecution in rebuttal. Dr. Glaser testified that after examining defendant and reviewing a great deal of case information, he concluded defendant suffered from "no current major mental illness," but had low self-esteem, was uncomfortable acknowledging his feelings, and was willing to suffer "unpleasant conditions" to remain near the person on

whom he was dependent. Defendant had no disorders rendering it more likely that he would falsely confess. Dr. Glaser also evaluated defendant for amnesia and concluded defendant was malingering because he recalled nothing even after being given cues from the transcripts.

Dr. Chidekel evaluated defendant, administering numerous psychological tests, and determined defendant suffered from "avoidance [*sic*] personality disorder, with self-defeating and dependent features." Based on the tests administered, Dr. Chidekel was otherwise unable to diagnose defendant with any neuropsychological condition that interfered with his "ability to see, to understand, or to be able to communicate effectively."

We have previously described the shifts in the law governing court-ordered psychological examinations like the one ordered in this case. "At the time of defendant's trial in [2001], decisional law authorized trial courts to order a defendant who placed his or her mental state in issue to submit to mental examination by prosecution experts. [Citation.] This court later held that after the 1990 passage of Proposition 115 (the Crime Victims Justice Reform Act), which resulted in the enactment of the criminal discovery statutes, the courts 'are no longer free to create such a rule of criminal procedure, untethered to a statutory or constitutional base.' (*Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1116 (*Verdin*).) We have applied *Verdin* retroactively." (*People v. Clark* (2011) 52 Cal.4th 856, 939, fn. omitted (*Clark*).)

"Shortly after *Verdin*, the Legislature amended [Penal Code] section 1054.3 to expressly authorize courts to compel a mental examination by a prosecution-retained expert. (See

[Pen. Code,] § 1054.3, subd. (b), as amended by Stats. 2009, ch. 297, § 1.)" (*People v. Banks* (2014) 59 Cal.4th 1113, 1193.) But in *Banks*, we concluded that *Verdin* continues to apply to cases predating that amendment. (*Banks*, at p. 1193.) This is such a case. For that reason, the Attorney General concedes that "*Verdin* compels the conclusion that it was error under state law to require [defendant] to submit to mental examinations by prosecution experts." It follows that it was also error for the trial court to admit testimony by the prosecution's experts based on their interviews with defendants. (*Clark*, *supra*, 52 Cal.4th at p. 940.) The Attorney General urges, however, that these errors were harmless under the relevant standard articulated in *Watson*, *supra*, 46 Cal.2d at page 836. We agree.

In *Clark*, *supra*, 52 Cal.4th at page 940, we rejected the argument that errors in mandating examination by prosecution experts are subject to review under the more demanding standard for federal constitutional error set forth in *Chapman v. California, supra*, 386 U.S. 18. We explained that we were aware of no decision "holding that the Fifth Amendment or any other *federal constitutional* provision prohibits a court from ordering a defendant who has placed his or her mental state in issue to submit to a mental examination by a prosecution expert." (*Clark*, at p. 940.) "We thus assess the errors for prejudice under the standard for state law error, inquiring whether there is a reasonable probability that the outcome of trial would have been more favorable to defendant had the court not ordered him to submit to examinations by" prosecution-retained experts. (*Id*. at pp. 940–941.)

We conclude it is not reasonably probable that the outcome of the trial would have been more favorable had defendant not undergone examinations conducted by prosecution-retained

experts.  Defendant gave his friend Casey Sheehan a detailed confession to Nick's murder and confessed to the detectives that "the only thing he did was kill" Nick.  The details of defendant's confession to Sheehan were corroborated by witnesses who spent time with Nick at the Lemon Tree Inn before he was killed and those who found his body in a shallow grave covered by a bush.  On the other hand, defendant's claim of amnesia was a highly selective one:  He claimed that although he remembered enough of the events surrounding the crimes to exonerate himself and shift blame to his codefendants, he experienced a brief lapse in memory that happened to coincide with the period during which he confessed to police detectives.  It is not reasonably probable that, had the prosecution's experts not testified to their findings based on their examination of defendant, the jury would have discredited defendant's confessions and instead credited his claim of amnesia.  Under the circumstances, we conclude there is no reasonable probability that the jury would have reached a result more favorable to defendant had the court not issued an order requiring him to submit to mental examination by Drs. Glaser and Chidekel and had these experts not testified against defendant based on those examinations.

### 6.    *Prosecutorial Misconduct During the Guilt Phase Closing Argument*

Defendant alleges the prosecutor engaged in numerous instances of misconduct during his closing argument.  He failed to object to nearly all such instances and has therefore forfeited these claims on appeal.  In any event, no misconduct occurred.

As we have explained, to preserve a claim of prosecutorial misconduct for appeal, " ' "a criminal defendant must make a timely and specific objection and ask the trial court to admonish

the jury to disregard the impropriety.” ’ [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.” (*People v. Powell* (2018) 6 Cal.5th 136, 171.) “ ‘ “A prosecutor’s misconduct violates the Fourteenth Amendment to the United States Constitution when it ‘infects the trial with such unfairness as to make the conviction a denial of due process.’ [Citations.] In other words, the misconduct must be ‘of sufficient significance to result in the denial of the defendant’s right to a fair trial.’ [Citation.] A prosecutor’s misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves ‘the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.’ ” ’ ” (*Id.* at p. 172.) To the extent the alleged instances of misconduct were not forfeited by defendant’s failure to object, we conclude none infected the trial with unfairness or deceived the court or jury.

Defendant first contends that the prosecutor argued “facts not in evidence” when he stated in closing argument that defendant did “ ‘considerably more’ ” than shoot the victim and was “ ‘probably involved in the taping and the burial process, if not digging the grave.’ ” Defendant did not object to this argument at trial and does not argue that objection would have been futile. The claim is therefore forfeited. (See *People v. Powell, supra*, 6 Cal.5th at p. 171.)

But the claim lacks merit in any event. Defendant’s argument presumes that the only basis for the prosecutor’s argument was certain statements conveyed by Pressley to Detective Jerry Cornell. Detective Cornell testified to some of Pressley’s out-of-court statements at trial, but because Pressley himself did not testify, Detective Cornell was not permitted to

relay certain statements implicating defendant in the grave-digging and burial. When Detective Cornell nevertheless testified that Pressley had said "they"—presumably meaning both Pressley and defendant—had buried the victim, the trial court admonished the jury to ignore the use of the pronoun "they" and to consider only that portion of Detective Cornell's statement relaying that Pressley went to Lizard's Mouth and dug the grave. Defendant argues that the prosecution violated the court's ruling by referring to Pressley's statements in closing argument.

Pressley's statements were not, however, the only basis for the argument. Sheehan told the jury that defendant came to him asking for advice and told him Nick had been shot "somewhere in the middle of nowhere." Defendant also told Sheehan that after shooting the victim, he put a bush over him. This testimony was consistent with the evidence of where and how hikers found Nick's body. The prosecutor's reference to defendant "probably" doing more than shooting the victim was a reasonable commentary on the evidence and does not constitute misconduct. (See *People v. Farnam* (2002) 28 Cal.4th 107, 168.)

Defendant next argues that the prosecutor committed misconduct by telling the jury that none of the experts, including Dr. Kania, testified that defendant gave a false confession. Defendant objected to the argument on the ground that the prosecution was "arguing the Court's restriction on the evidence." In response, the trial court clarified for the jury that none of the experts had so testified because the court had previously ruled that no expert would be permitted to give an opinion as to whether or not a false confession was given in this case; the question was instead one for the jury to decide. Both

the prosecutor and defense counsel thanked the court for the clarification, and the prosecutor resumed the closing argument.

To the extent defendant now believes the trial court's clarification was insufficient, he has forfeited the objection. (*People v. Powell, supra*, 6 Cal.5th at p. 171.) But even were his claim preserved, we would find no error. The prosecutor's remarks were accurate, if susceptible to misunderstanding. The court cleared up any possible misunderstanding with its clarification. (See *ibid.*)

Defendant also argues that the prosecutor referred in closing argument to "side B" of defendant's confession, during which defendant was asked whether it occurred to him that what he was doing was "wrong" and defendant replied, "Honestly? [¶] Hell yes. Right before." Defendant has forfeited any challenge to the prosecutor's argument regarding "side B" of defendant's confession by failing to object. (*People v. Powell, supra*, 6 Cal.5th at p. 171.)

Defendant argues that the prosecutor committed misconduct during the guilt phase closing argument by making improper remarks about witness Sheehan, who had testified under a grant of immunity. First, the prosecutor argued the jury could be assured that Sheehan would be even more truthful than other witnesses because he was subject to greater consequences for lying. Second, the prosecutor argued the jury could infer that Sheehan would not have needed immunity if defendant were innocent because otherwise Sheehan would have been harboring a friend, not a fugitive. Defendant objected, claiming the prosecution's argument was speculative. The court sustained the objection and admonished the jury to disregard the prosecutor's remarks. Defendant now renews his

objection to the prosecutor's remarks, arguing the prosecutor impermissibly vouched for Sheehan based on the prosecutor's own personal beliefs (and decisions about how and why to grant witness immunity), rather than evidence in the record. (See *People v. Martinez* (2010) 47 Cal.4th 911, 958.) But defendant offers no persuasive reason to believe the trial court's admonition to disregard the prosecutor's brief, passing remarks was insufficient to cure any unfairness. We see no basis for reversal.

Finally, defendant argues that the prosecutor committed misconduct by spending six transcript pages describing the "original" kidnap, in which defendant was not involved. In fact, the prosecutor spent less than two transcript pages describing the kidnapping, and some of the events described involved defendant. The prosecutor referred to the victim's abduction from West Hills, his time in Santa Barbara, and his murder, arguing "there is a kidnapping at the very beginning, there's a kidnapping at the very end. Is there a kidnapping in between? Okay." The defense did not object to this discussion. Assuming for the sake of argument that this claim is not forfeited despite the lack of specific, contemporaneous objection (see *People v. Seumanu* (2015) 61 Cal.4th 1293, 1339), we find no misconduct because the prosecutor has "wide latitude to comment on the evidence during closing argument." (*People v. Peoples* (2016) 62 Cal.4th 718, 797.) Discussion of a significant aspect of the criminal endeavor that culminated in the victim's death during closing argument constitutes a reasonable comment. (*Ibid*.)

### 7. *Instructional Error Concerning Accomplices and Immunity*

Defendant argues the trial court erred by failing to modify CALJIC No. 3.16, concerning accomplice testimony, and

CALJIC No. 2.20, concerning witness credibility. Defendant also argues the court erred by failing to give CALJIC No. 3.19, concerning the determination whether a corroborating witness is an accomplice. We find no grounds for reversal.

### a. CALJIC No. 3.16

Penal Code section 1111 provides that an accomplice's testimony cannot support a conviction without corroboration by other evidence "as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." The statute defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*; *People v. Gomez* (2018) 6 Cal.5th 243, 307; see *id.* at p. 308.)

On November 2, 2001, defendant submitted his list of proposed jury instructions, which included CALJIC No. 3.16, Witness Accomplice as Matter of Law. Defendant listed Rugge, Pressley, Hollywood, Sheehan, and Affronti among the witnesses to be included in the instruction. But when the jury was ultimately instructed with CALJIC No. 3.16, the instruction named only two of these individuals: "If the crimes charged were committed by anyone, Jesse Rugge and Graham Pressley were accomplices as a matter of law and their testimony is subject to the rule requiring corroboration."

The record does not reveal why the instruction named only Rugge and Pressley. Defendant explains that the trial court conducted an " 'informal' " conference with the attorneys to address jury instructions, and the content of that conference was not settled or recorded. Defendant argues he should not be

faulted for the lack of recorded proceedings and contends the denial of his request to name Skidmore, Hollywood, and Sheehan in CALJIC No. 3.16 should be deemed preserved for appeal.

Even assuming the claim has been adequately preserved, the claim lacks merit. Although the informal conference may not have been recorded, defense counsel conceded on the record that Sheehan was not an accomplice and was therefore not an appropriate person to include among those listed in CALJIC No. 3.16. And although Skidmore and Hollywood "meet [Penal Code] section 1111's definition of an accomplice" in that "[e]ach was liable to prosecution . . . for the identical offenses charged against defendant" (*People v. Williams* (1997) 16 Cal.4th 635, 682), neither Skidmore nor Hollywood provided statements requiring corroboration, which is the concern of CALJIC No. 3.16.

"A court must instruct on the need for corroboration only for accomplice *testimony* ([Pen. Code,] § 1111); ' " 'testimony' within the meaning of . . . [Penal Code] section 1111 includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances." ' " (*People v. Williams, supra*, 16 Cal.4th at p. 682.) " 'The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police.' [Citation.] 'On the other hand, when the out-of-court statements are not given under suspect circumstances, those statements do not qualify as "testimony" and hence need not be corroborated under . . . section 1111.' " (*People v. Williams* (1997) 16 Cal.4th 153, 245.)

Here, neither Skidmore nor Hollywood testified at trial, but defendant identifies various out-of-court statements they made that were admitted through other witnesses. For example, defendant himself testified Skidmore had told him "Ben's brother had been killed" several days before Nick's body was found. Other witnesses testified to statements Hollywood made to his fellow codefendants and others about Nick's kidnap. And witnesses reported statements Hollywood made to his father and Hogg in which Hollywood described the crime without owning up to his role in it. But none of these statements were made under "suspect circumstances" undermining their reliability. (*People v. Williams*, *supra*, 16 Cal.4th at p. 682 ["[S]tatements made in the course of and in furtherance of the conspiracy were not made under suspect circumstances and therefore were sufficiently reliable to require no corroboration."].) Accordingly, we find no error in the trial court's decision not to name Skidmore and Hollywood in the jury instruction concerning corroboration of accomplice testimony.

### b.    CALJIC No. 3.19

Defendant also requested that the jury be instructed with CALJIC No. 3.19, entitled "Burden to Prove Corroborating Witness Is an Accomplice." The instruction states: "You must determine whether the witness [blank] was an accomplice as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that [blank] was an accomplice in the crime[s] charged against the defendant." (CALJIC No. 3.19.) Defendant now says he proposed filling the blank with witness Casey Sheehan and argues that whether Sheehan was an accomplice constituted a question of fact the jury should have been permitted to determine.

We conclude the claim of error fails because, as noted above, defense counsel agreed on the record that Sheehan—who was not charged with any of the same offenses as defendant or his codefendants—was not an accomplice. In any event, any error would have been harmless because the jury was adequately instructed concerning the definition of accomplices pursuant to CALJIC No. 3.10, which states that "[a]n accomplice is a person who [is] . . . subject to prosecution for the identical offense charged . . . against the defendant on trial by reason of . . . [being a member of a criminal conspiracy]," and the need for corroboration of accomplice testimony. It is not reasonably probable the jury would have returned a more favorable result had it also been instructed with CALJIC No. 3.19. (*Watson*, *supra*, 46 Cal.2d at p. 837 [setting forth standard for evaluating harmlessness of state law error]; see *People v. Carpenter* (1997) 15 Cal.4th 312, 393 ["Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution"].)

### c.     *CALJIC No. 2.20*

At trial, the jury was instructed with CALJIC No. 2.20 concerning the "believability of a witness." The instruction told jurors to "consider anything that has a tendency reasonably to prove or disprove the truthfulness" of witness testimony and listed numerous factors, including "demeanor," whether the witness had "bias, interest, or other motive" to testify, and "[w]hether the witness is testifying under a grant of immunity." Defendant argues that, unbeknownst to the jury, a number of witnesses in addition to Sheehan—namely, Adams-Young, Affronti, Carpenter, Hogg, John Hollywood, and Lasher—received immunity in exchange for their testimony. He contends

the court should have modified CALJIC No. 2.20 to specifically identify all of the witnesses testifying under a grant of immunity and to advise the jury to view their testimony with " 'care and caution.' "

At trial, defendant made no request to identify any declarant other than Sheehan who testified under a grant of immunity and thus forfeited that claim. But the claim fails regardless. There is no duty to instruct a jury that the testimony of immunized witnesses must be viewed with care and caution. (*People v. Daniels* (1991) 52 Cal.3d 815, 867, fn. 20 ["Defendant points to no authority requiring the court to instruct the jury that immunized-witness testimony is to be viewed with distrust. We have held that the court has no such duty to instruct sua sponte."]; see also *People v. Leach* (1985) 41 Cal.3d 92, 106.) It follows that the trial court did not err by failing to convey to the jury, via modification of CALJIC No. 2.20, which witnesses were testifying under a grant of immunity.

Finally, and in any event, the trial court's failure to modify CALJIC No. 2.20 could not have prejudiced defendant. The role these six witnesses played in the prosecution's case was minimal when compared with the substantial evidence of guilt presented at trial unrelated to their testimony, including defendant's own detailed confession and Sheehan's testimony that defendant killed the victim. Moreover, the jury was instructed to consider the witnesses' "bias, interest, or other motive" for testifying. (CALJIC No. 2.20.) It is not reasonably probable defendant would have achieved a more favorable result if jurors viewed the testimony of these six peripheral witnesses with somewhat greater caution. (See *People v. Lewis* (2001) 26 Cal.4th 334, 371; *Watson*, *supra*, 46 Cal.2d at p. 836.)

### D. Special Circumstances Claim

At one time, proof of the kidnap-murder special circumstance required that the prosecution show a defendant had an independent felonious purpose, " 'that is, the commission of the [kidnapping] felony was not merely incidental to an intended murder.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 62–63; *id.* at p. 117; see *People v. Brents, supra,* 53 Cal.4th at pp. 608–609.) The statute was amended to eliminate this independent felonious purpose requirement in 1998, five months before the crimes at issue here. (See Pen. Code, § 190.2, subd. (a)(17)(M), added by Stats. 1998, ch. 629, § 2, p. 4165, and approved by voters, Primary Elec. (Mar. 7, 2000); *Brooks*, at p. 63, fn. 8; *Brents*, at pp. 608–609, fn. 4.)[11] Nonetheless, the jury in this case was instructed to find an independent felonious purpose to kidnap. Defendant now argues the evidence was insufficient to support the jury's finding. And although he acknowledges that the statute then in force did not, in fact, require the jury to make such a finding, defendant contends that without the independent felonious purpose requirement, the kidnap-murder special circumstance is unconstitutional. We reject the first part of this argument, which makes it unnecessary to address the second: Because the jury was instructed on the independent felonious purpose requirement and because the evidence was sufficient to support the jury's finding that the requirement was

---

[11] As amended in 1998, Penal Code section 190.2, subdivision (a)(17)(M) provides, "To prove the special circumstance[] of kidnapping[,] . . . if there is specific intent to kill, it is only required that there be proof of the elements of th[at] felon[y]. If so established, [the] special circumstance[] [is] proven *even if the felony of kidnapping . . . is committed primarily or solely for the purpose of facilitating the murder*." (Italics added.)

satisfied, we need not decide here whether the kidnap-murder special circumstance is constitutional in the absence of an independent felonious purpose requirement. (See, e.g., *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1102 ["Our jurisprudence directs that we avoid resolving constitutional questions if the issue may be resolved on narrower grounds."]; see *id.* at p. 1103.)

The jury here was instructed that, to find the special circumstance of kidnap felony murder true, "it must be proved, one, the murder was committed while the Defendant was engaged in the commission of a kidnapping; or, two, the murder was committed in order to carry out or advance the commission of the crime of kidnap, or to facilitate the escape therefrom, or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the kidnap was merely incidental to the commission of the murder."[12]

" 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

---

[12] At oral argument, defendant argued for the first time that this instruction was defective because the "or" in the first sentence of the instruction would have conveyed to the jury that it could find the special circumstance true so long as it concluded that "the murder was committed while the Defendant was engaged in the commission of a kidnapping," even if it did not find that defendant had an independent purpose to kidnap Nick. While it does appear the disjunctive "or" in the first sentence was included in error, we see no likelihood that the jury was confused by it. The second sentence of the instruction unambiguously informed the jury that "the special circumstance . . . is not established if the kidnap was merely incidental to the commission of the murder." The instruction thus expressly told the jurors that they must find an independent felonious purpose to find the special circumstance true.

found [this] element[] of the crime beyond a reasonable doubt." ' [Citation.] 'Substantial evidence' is evidence which is ' "reasonable in nature, credible, and of solid value." ' " (*People v. Morgan* (2007) 42 Cal.4th 593, 613–614.)

Defendant's sufficiency of the evidence argument depends on the premise that the evidence established two separate kidnappings, only the second of which involved defendant. Defendant argues that "the jury may have applied an incorrect theory if it believed [defendant] committed the murder in order to assist Hollywood in avoiding detection for the August 6th completed kidnap." And to the extent the jury instead focused on defendant's later act of moving Nick to the gravesite at Lizard's Mouth, defendant argues there was insufficient evidence to support a finding that defendant had an independent purpose to kidnap Nick: "[N]o properly-instructed rational trier of fact could have found that this 'second kidnap' (if it were a 'kidnap') was not merely incidental to the murder, with the murder being the defendant's primary purpose."

Defendant's argument suffers from an overly narrow view of the kidnap, one inconsistent with our duty to view the evidence in the light most favorable to the prosecution. As already noted, the indictment charged defendant and his codefendants with a continuing kidnapping offense that extended over the period of time from when the victim left his home and was taken to Santa Barbara, to the time he spent in Santa Barbara, and the time he was taken from locations within Santa Barbara to the site of his murder. As previously discussed, there was evidence from which a jury could conclude defendant moved Nick against his will as part of that single, continuous kidnapping. In addition, there was evidence from which the jury could conclude the murder was committed to

"advance the commission of the crime of kidnap, or to facilitate the escape therefrom, or to avoid detection." The jury could conclude that Nick was murdered to silence him and eliminate the risk the kidnappers—including defendant, who belatedly joined in the kidnapping—would be caught and that defendant shared that purpose. In short, there was substantial evidence from which the jury could conclude the kidnap was more than incidental to the murder—indeed, that the kidnap was the reason for the murder and not the other way around.

### E. Penalty Phase Claims

#### 1. *Prosecutorial Misconduct During the Penalty Phase Closing Argument*

Defendant argues his rights to due process, a fair trial, and a reliable penalty determination under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were violated by the prosecutor's prejudicial misconduct during penalty phase closing argument. We hold defendant's claims of prosecutorial misconduct are forfeited and lack merit in any event.

#### a. *Background*

During penalty phase closing argument, the prosecutor described the various factors in aggravation and mitigation under Penal Code section 190.3, including factor (k). Specifically, the prosecutor explained that factor (k) evidence included " '[a]ny other circumstances which extenuate[] the gravity of the crime.' " The prosecutor continued, "This is the part where you can really consider just about anything you want, and this is the part where the defense will ask you to consider the fact that he had a childhood that was less than stellar, that that would be considered a matter in mitigation for

your consideration." The prosecutor described defendant's "dysfunctional family," including defendant's sister, a 23- or 24-year-old "life-long heroin addict"; defendant, the second child, who "manages to commit a horrific murder before the age of 21"; and defendant's younger brother who, at age 16 "commits a crime so scary and so horrible that he's not only tried as an adult in this home invasion armed robbery at age 16, but he's given a sentence of 12 years in state prison. I mean, that's a remarkable sentence for a teenager to receive, that is to believe that there's nothing redeemable about this person at all." The prosecutor also described defendant's home as "dysfunctional," his mother as neurotic, his father as heavy-handed, and argued "they batted zero with the accomplishments of all three of the children in this family."

The prosecutor suggested to the jury that the defense was "effectively saying," with the Penal Code section 190.3, factor (k) evidence, "that the consequence of this childhood has created somebody who really lacks any notion of empathy at all for other people. And aren't they really saying that that is in effect a violent person?" The prosecution described defendant as "a person whose childhood was so completely lacking in morality that he's missed that part of his education and his development," which "speak[s] to his dangerousness." The prosecutor asked how that could be considered "a matter in mitigation as against any matter in aggravation," leaving it for the jury to "consider during your deliberation." Defendant raised no objection to these characterizations. The prosecutor also addressed Penal Code section 190.3, factor (i), "[t]he age of the defendant at the time of the crime," explaining that if defendant had been 17 as had been "one of the co-defendants, Mr. Pressley, then maybe that would be a factor to give a lot of consideration to." Because

defendant was 20 years old, within days of turning 21, at the time he committed the offense, the prosecutor argued, the amount of consideration owed his age was "minimal." The prosecutor noted that defendant's age was the same as most college seniors and "among the older ones" of "our fighting force currently in Afghanistan." Defendant raised no objection.

Finally, the prosecutor focused heavily on the alternative to a death sentence, urging the jury to conclude that "three meals every single day" was better than the life defendant had prior to imprisonment, other than the "freedom of movement like he had before." If defendant faced a life sentence, he would be given a warm bed, friends, possibly a girlfriend, hot meals every day, and the ability to play basketball, "to feel the rush of running to a basket and being able to score." The prosecutor urged the jury to conclude this was insufficient punishment for "the worst" type of crime, an "intentional killing of a child for no more reason than because it improved his temporary status, his moment of comfort at that moment in time," committed with "planning and preparation and premeditation and thought and deliberation." Defendant did not object.

### b. Discussion

Defendant argues that the prosecutor committed prejudicial misconduct by suggesting that defendant's family history and age were factors in aggravation. As an initial matter, the claim is forfeited because defendant failed to object. "In order to preserve any claim of prosecutorial misconduct, there must be a timely objection and request for admonition. [Citation.] ' "[O]therwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 786.)

Although defendant alleges that an objection would have been futile, he fails to demonstrate there were prior efforts to object that were overruled.

The claim lacks merit in any event. The prosecutor argued that defendant's age and family background must be considered under Penal Code section 190.3, factors (i) and (k), read the language of those factors, and described the relevant facts. The prosecutor referenced defendant's family history, questioning how "a childhood . . . completely lacking in morality" was "a matter in mitigation against any matter in aggravation," and urged the jury to consider that question while deliberating. How the jury ultimately weighed these facts is of no moment provided the jury was properly instructed, and here they were. (Cf. *People v. Sims* (1993) 5 Cal.4th 405, 464 [where prosecutor "did not imply that the jury should disregard the evidence of [the] defendant's background, but rather that, in relation to the nature of the crimes committed, it had no mitigating effect," prosecutor's remarks "fall within the bounds of proper argument"].) The prosecutor urged the jury not to consider defendant's age as a factor in mitigation, explaining that were defendant 17 years old like codefendant Pressley, the jury might give greater weight to his age. At the time of trial, defendants as young as 16 could receive the death penalty. (*Stanford v. Kentucky* (1989) 492 U.S. 361; contra, *Roper v. Simmons* (2005) 543 U.S. 551 [declaring the death penalty for 16- and 17-year-olds unconstitutional].) A jury could rationally differentiate between the culpability of a 17 year old and someone nearly 21. It was not misconduct for the prosecutor to urge the jury to give defendant's age little weight as a factor in mitigation. (See *People v. Dykes*, *supra*, 46 Cal.4th at p. 787.)

Defendant also argues that the prosecutor committed misconduct by presenting evidence concerning conditions of confinement under a life sentence. Defendant contends such evidence is not relevant under Penal Code section 190.3, factor (k). "[E]vidence concerning conditions of confinement for a person serving a sentence of life without possibility of parole is not relevant to the penalty determination because it has no bearing on the defendant's character, culpability, or the circumstances of the offense under either the federal Constitution or [Penal Code] section 190.3, factor (k)." (*People v. Martinez, supra,* 47 Cal.4th at p. 963.) But defendant failed to object to the prosecutor's argument concerning conditions of confinement; accordingly, any claim of error is forfeited. (*Ibid.*) Even if preserved, any error in admitting the statement was harmless, as the prosecutor's comment did not so "infect[] the trial with . . . unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

### 2. *Challenges to California's Death Penalty Statute*

Defendant raises a number of challenges to California's death penalty law, each of which we have previously rejected.

" '[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 767, quoting *People v. Dykes, supra,* 46 Cal.4th at p. 813.)

Penal Code section 190.3, factor (a), which permits a jury to consider the circumstances of the offense in sentencing, does not result in arbitrary or capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, or Fourteenth

Amendments to the United States Constitution. (*People v. Simon* (2016) 1 Cal.5th 98, 149.)

The "death penalty statute 'is not invalid for failing to require . . . unanimity as to aggravating factors [and] proof of all aggravating factors beyond a reasonable doubt' "; *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584, do not alter that conclusion. (*People v. Lopez* (2018) 5 Cal.5th 339, 370; see *People v. Lewis* (2008) 43 Cal.4th 415, 533 [aggravating factors need not be found beyond a reasonable doubt].) Nor is the death penalty statute unconstitutional for "permitting jury consideration of a defendant's unadjudicated violent criminal activity under [Penal Code] section 190.3, factor (b)." (*Bryant, supra*, 60 Cal.4th at p. 469.)

Defendant's claims concerning the burden of proof are identical to those we considered and rejected in *People v. Mendoza* (2011) 52 Cal.4th 1056, 1096: " ' "The death penalty scheme is not unconstitutional because it fails to allocate the burden of proof—or establish a standard of proof—for finding the existence of an aggravating factor." ' " "Nor was the trial court required to instruct the jury that there is no burden of proof at the penalty phase. [Citation.] The federal Constitution does not require that the state bear some burden of persuasion at the penalty phase, and the jury instructions were not deficient in failing to so provide." (*Ibid.*)

CALJIC No. 8.88 provides the jury with sufficient guidance to administer the death penalty and meet constitutional minimum standards. "More specifically, CALJIC No. 8.88's use of the . . . term 'warranted' . . . does not render the instruction impermissibly vague or ambiguous. [Citations.] Where, as here, the jury is instructed in the language of CALJIC

No. 8.88, the court need not further instruct that life without parole is mandatory if mitigation outweighs aggravation, or that life without parole is permissible even if aggravation outweighs mitigation." (*People v. Mendoza, supra,* 52 Cal.4th at p. 1097, fn. omitted.)

"The failure to instruct the jury that the prosecution bears some burden of persuasion regarding the jury's penalty determination does not violate the Sixth, Eighth or Fourteenth Amendment." (*People v. Taylor* (2010) 48 Cal.4th 574, 662.) "Nor does the failure to instruct jurors they must unanimously agree on the existence of particular aggravating factors, but not on the existence of any mitigating factors, violate the Sixth, Eighth, or Fourteenth Amendment." (*Ibid.*) "There is no constitutional requirement that a trial court instruct the jury on the ' "presumption of life." ' " (*Ibid.*, quoting *People v. Whisenhunt* (2008) 44 Cal.4th 174, 228.)

The lack of written jury findings during the penalty phase does not violate due process or the Eighth Amendment, nor does it "deprive a capital defendant of meaningful appellate review." (*People v. Winbush* (2017) 2 Cal.5th 402, 490, citing *People v. Linton* (2013) 56 Cal.4th 1146, 1216.)

"Intercase proportionality review, comparing defendant's case to other murder cases to assess relative culpability, is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution." (*People v. Winbush, supra,* 2 Cal.5th at p. 490.) " 'California's death penalty law does not violate equal protection by treating capital and noncapital defendants differently.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 425.) California's death

penalty statute does not violate international law. (*Ibid*; see also *People v. Sánchez* (2016) 63 Cal.4th 411, 488.)

### F. State Bar Motion to Quash Defendant's Subpoena

On February 13, 2002, defendant's retained counsel, Cheri A. Owen, submitted a tender of resignation, with charges pending, from the State Bar. She resigned from the State Bar, again with charges pending, on April 17, 2002. In July of that year, defendant subpoenaed Owen's records from the State Bar. The State Bar moved to quash the subpoena, and the trial court granted the motion. Defendant contends this was error. We disagree.

Defendant's subpoena sought " '[a]ny and all documents pertaining to attorney CHERI A. OWEN, who was admitted to the California State Bar on June 9, 1999, with state bar number 201893. The documents should include but are not limited to all notes, reports, complaints, and investigative notes and reports.' " The State Bar moved to quash the subpoena on grounds that the request for "any and all" records was overbroad and that the information sought was privileged and confidential. In response, defendant's counsel argued that in camera review of all State Bar complaints related to Owen was necessary to ascertain whether Owen performed deficiently for clients other than defendant while defendant's trial was ongoing. This would, he claimed, help determine whether Owen performed adequately during defendant's trial.

The trial court granted the State Bar's motion to quash on grounds that the documents were privileged. And while the court acknowledged that due process might nevertheless require release if the requested information met a certain standard of

relevance, defendant had not made such a showing. The court explained the best lens through which to view whether or not Owen competently performed her duties while representing defendant was "looking at what Miss Owen did or did not do in connection with this case. If she didn't make the proper investigation, if she didn't talk to the witnesses she should have talked to, if she didn't properly prepare her briefs or the legal issues in the case, if she didn't properly present the case in trial, that's what you look at, and that's the proof of the pudding." Looking at a complaint made by someone else would have no bearing on the adequacy of her performance in defendant's case. The trial court also denied defendant's request that the requested documents be produced to the court and sealed.[13]

Contrary to defendant's arguments, we see no error in the trial court's ruling. Numerous provisions of law establish the privileged and confidential status of the information defendant sought from the State Bar. For example, Business and Professions Code section 6086.1, subdivision (b) provides that State Bar disciplinary investigations are confidential until charges are filed. Business and Professions Code section 6094 further provides that complaints made to a disciplinary agency regarding attorney misconduct issues or incompetence are privileged. The State Bar Rules of Procedure, rules 2301 and 2302(a), likewise state, respectively, "the files and records of the Office of the Chief Trial Counsel are confidential" and, with

---

[13] In record augmentation proceedings that took place in 2009 in anticipation of briefing before this court, defendant's counsel argued Owen's State Bar records might have relevance to an eventual habeas corpus proceeding before this court. With that in mind, the trial court ordered the State Bar to preserve the records.

exceptions, "information concerning inquiries, complaints or investigations is confidential."

Nor has defendant established that the ruling violated his due process rights. Defendant invokes the high court's decision in *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57–58, in which the court ruled that a defendant accused of child sexual abuse was entitled to have a court conduct an in camera review of confidential case reports that might have contained evidence relevant to his defense. But here, by contrast, the information defendant sought to obtain from the State Bar was not relevant to defendant's case. Defendant sought information about complaints made by others about Owen's performance as a lawyer but failed to show how complaints made by others would bear on whether she committed prejudicial errors in her representation of defendant. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687.) Accordingly, we conclude the trial court's decision granting the State Bar's motion to quash defendant's subpoena for Owen's records was not in error.

## G. Denial of Motion for New Trial

Defendant also filed a motion seeking a new trial on numerous grounds, including, as relevant here, Owen's deficient performance as defense counsel. The trial court denied the motion without holding a hearing. Defendant contends this was error. We conclude the trial court acted within its discretion in disposing of the new trial motion.

### 1.   *Background*

On March 19, 2002, defendant filed motions for new guilt and penalty phase trials via *Keenan*[14] counsel Richard V. Crouter.  Numerous declarations and memoranda of points and authorities followed, and the motion, initially set to be heard on March 25, 2002, was not heard until February 7, 2003.  In the meantime, defendant retained new counsel, Robert Sanger, and Crouter was relieved.  Sanger made supplemental arguments in support of the new trial motion, largely focused on the adequacy of defense counsel's performance at trial.  In support of the motion, counsel contended that Attorney Owen—who had been admitted to the State Bar just two years before the trial began and who would resign from the Bar before the proceedings were over—was "woefully inexperienced and fell short of the minimum standards of competence required of defense counsel in a capital case."

The trial court addressed and rejected each of the claims of error raised in the new trial motion, including the claims of ineffective assistance of counsel.

### 2.   *Discussion*

Defendant raises several challenges to the trial court's denial of the new trial motion.  " ' " 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.'  [Citations.]  ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling

---

[14]   *Keenan v. Superior Court* (1982) 31 Cal.3d 424.  In *Keenan*, we held Penal Code section 987.9 funds may be used to appoint a second attorney for a defendant in a capital case. (*Keenan*, at p. 434.)

absent a manifest and unmistakable abuse of that discretion." ' " ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.) We find no such abuse of discretion here.

As a procedural matter, defendant contends the trial court erred by ruling on the new trial motion without holding an evidentiary hearing that would have permitted him to adduce new evidence in support of his ineffective assistance claims. He further contends the trial judge's consideration of the motion was rushed and inadequate due to the trial judge's imminent retirement. These procedural arguments lack merit. The trial court was not required to hold an evidentiary hearing on the new trial motion; the court's "only obligation is to ' " 'make whatever inquiry is reasonably necessary' " to resolve the matter.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 517.) And the record does not support defendant's claim that the trial court rushed to dispose of the motion without thoroughly considering its merits. On the contrary, the court granted numerous extensions to allow defense counsel the opportunity to augment the new trial motion and to allow the prosecutor an opportunity to respond. The motion, initially set to be heard in March 2002, was not heard until almost one year later, in February 2003. The trial court thereafter issued a thoroughly reasoned denial of the motion; its order alone comprises 23 pages of transcript, and the discussion spans dozens of pages on top of that. There is no basis for defendant's suggestion that the trial court cut corners in considering the motion.

On the merits, defendant contends that the trial court erred in rejecting his claim that he did not receive the effective assistance of trial counsel guaranteed by the United States and California Constitutions. Usually, "ineffective assistance [of counsel claims are] more appropriately decided in a habeas

corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.) But we have also held that a defendant may raise the issue of counsel's effectiveness as a basis for a new trial, and, to expedite justice, a trial court should rule "[i]f the court is able to determine the effectiveness issue on such motion." (*People v. Fosselman* (1983) 33 Cal.3d 572, 582–583.) To make out a claim that counsel rendered constitutionally ineffective assistance, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) To make out an ineffective assistance claim on the basis of the trial record, the defendant must show "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

Here, in support of his new trial claim, defendant emphasizes Owen's remarkable lack of professional experience—she was a new lawyer who had never before worked on a capital case—and the cloud under which she abruptly exited the representation of defendant (and the profession as a whole). He notes that Owen did not satisfy the criteria for appointed trial counsel in a capital case. (See Cal. Rules of Court, rule 4.117.)

But Owen was not appointed by the court; she was privately retained. And although defendant's appellate counsel suggested otherwise at oral argument, Owen's brief history as a lawyer and the circumstances of her resignation from the bar do not establish that defendant was totally deprived of counsel during trial, requiring automatic reversal of the judgment. (*United States v. Cronic* (1984) 466 U.S. 648, 658–659.) Although defendant alleges Owen was absent for portions of jury selection and guilt phase testimony because she was meeting with a State Bar investigator, Owen was, in fact, present during most of the trial (as was *Keenan* counsel, who was present during those portions of trial when Owen was absent). Owen made arguments and objections; she presented witnesses. The question before us, at this juncture, is whether the trial record alone establishes that her performance fell below professional norms and that there is a reasonable probability that her deficient performance affected the result. Defendant has not made the necessary showing. The trial court therefore did not err in concluding it could not determine counsel was ineffective in the context of defendant's new trial motion. (*People v. Fosselman, supra,* 33 Cal.3d at pp. 582–583.)

Defendant contends that Owen did not adequately prepare a defense. This lack of preparation was demonstrated by Owen's failure to interview witnesses and to develop a guilt phase case because she felt the police investigation was adequate and because defendant had confessed. But defendant's primary argument regarding Owen's deficient performance concerns her failure to develop and present evidence that defendant suffered from brain damage or a similar impairment. In support of the argument, defendant introduced the opinion of Dr. Albert Globus, a psychiatrist. Based on a social and medical history

including an infantile skull fracture and febrile seizures, as well as postverdict neuropsychological testing, Dr. Globus opined that defendant suffered from organic brain syndrome. Defendant contends Owen was deficient for failing to develop and present such evidence of defendant's impairments because such evidence was "*the* best defense" to charges that defendant killed Nick with premeditation and deliberation, as is required for first degree murder, as well as "*the* most compelling showing of mitigation" at the penalty phase.

The trial court reasonably ruled that defendant's postverdict brain damage evidence was not a sufficient basis for granting a new trial. As to defendant's first point, after hearing defendant's evidence, the trial court concluded that competent counsel would not have presented a brain damage defense at the guilt phase "since it's inconsistent with what the defense actually presented, which seems to me, under the circumstances, was a better shot," given defendant's confession to police. "That defense was that this was a false confession and somebody else was the killer." The trial court noted that it had been presented with no cogent argument that the choice of this false confession strategy was itself the product of deficient performance.

Defendant criticizes the trial court's reasoning but fails to grapple with the court's central point: There are plausible reasons why competent counsel would choose not to present a brain damage defense in an attempt to negate the prosecution's showing of premeditation and deliberation. By defendant's own account to police, he accepted Hollywood's assignment to kill Nick; traveled from Los Angeles to Santa Barbara armed with a handgun; picked up Nick from the Lemon Tree Inn and transported him to a remote location where a grave had already

been dug; then shot Nick several times and buried him. This account strongly points to a conclusion that defendant acted with premeditation and deliberation when he killed Nick. As the trial court noted, competent counsel might reasonably determine that defendant's "better shot" was to convince the jury that the entire confession was false, rather than attempting to argue that defendant did in fact commit the crime but without premeditating or deliberating. Further, as we have previously noted, "presenting expert mental health testimony inherently risks inviting damaging cross-examination." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 624, fn. 5.) At least on this record, we cannot say the choice not to pursue a brain damage defense was incompetent. Nor has defendant shown that the presentation of such a defense would likely have changed the outcome of the trial.

Insofar as defendant argues that competent counsel would have presented the brain damage evidence to bolster his claim that his confession was false, the trial court reasonably rejected that argument as well. Defendant argued that brain damage evidence would have neutralized the prosecution's rebuttal witness, who opined that an individual would not falsely confess and claim amnesia without suffering serious mental illness or brain damage. But, the trial court noted, defendant's own expert had not agreed that brain damage was an "essential precondition to the person's predilection to give a false confession under certain circumstances," and had not relied on evidence of brain damage in offering his opinion in support of the defense. Under the circumstances, we cannot say there is no plausible reason why competent counsel would choose not to develop a brain damage defense and instead to rely on the opinion of the defense expert. And once again, defendant has

not shown that the presentation of his brain damage evidence would likely have altered the jury's view of whether to believe defendant's confession or instead to believe that he gave the confession while suffering from temporary amnesia, as he testified at trial.

Turning to the question of mitigation, the trial court concluded that defendant's newly presented evidence of mental defect or brain damage, even if available, would not have made a difference at the penalty phase. In making an independent determination of the propriety of the penalty, the trial court reweighed the mitigating circumstances that had been presented, including defendant's lack of criminal record, lack of violent history, peacemaking role among his friend group, excessive use of alcohol and marijuana, dependent personality, and obedience to Hollywood. The court concluded that no mitigating circumstance "appear[ed] to significantly extenuate the crime." The court concluded defendant's newly presented evidence of brain damage would not likely have altered the relevant balance of factors. We see no error in the court's determination.

Defendant's next claim of ineffective assistance centers on a set of two agreements executed in February 2002, in which defendant agreed to give Owen an "exclusive grant" to the media and literary rights to his background and story and to waive attorney-client privilege to permit Owen to speak and write about his criminal case. Defendant contends that these agreements created a conflict of interest that "tainted the representation *ab initio*," and that establish grounds for a new trial. The trial court disagreed, and we do as well.

As the trial court acknowledged, these agreements "grant[ed] [Owen] exclusive rights to exploit her client's story for her benefit," creating the potential for a conflict of interest. But to establish a deprivation of his constitutional right to counsel, defendant must show more than a " 'theoretical division of loyalties' "; he must show that counsel "labored under an actual conflict of interest *that affected counsel's performance.*' " (*People v. Doolin* (2009) 45 Cal.4th 390, 417.) Or as the trial court put it, to succeed on the conflict claim, "there has to be some showing of cause and effect, in other words, that the act or omission of the lawyer in seeking the benefits of the agreement has placed her client's defense in jeopardy." As the trial court explained, no such showing had been made here. Indeed, the agreements were made some two months after the jury rendered its penalty verdict and just one day before Owen tendered her resignation to the State Bar. And contrary to defendant's argument, nothing in the record shows that the parties had been operating under any comparable agreement previously, while Owen was still representing defendant at trial.

The case before us thus differs in critical respects from *People v. Corona* (1978) 80 Cal.App.3d 684, on which defendant relies. In that case, the record showed that trial counsel agreed to represent the defendant, who was facing 25 counts of first degree murder, in exchange for exclusive literary rights to the defendant's life story, including the criminal proceedings against him. (*Id.* at p. 703.) Trial counsel went on to make decisions in the interests of "his own pocketbook" rather than "the best interests of his client" (*id.* at p. 720), including the abandonment of mental defenses central to the case (*id.* at pp. 721, 727). No comparable circumstances are present here. The record neither shows that Owen labored under a potential

101

conflict of interest during the course of her representation of defendant, nor shows that "the conflict of interest . . . resulted in obvious prejudice" to defendant's case, as it had in *Corona*. (*Id*. at p. 720, fn. omitted.)

Finally, defendant asks us to compel the trial court to reconsider its handling of various other claims in the motion for new trial, including a claim that Owen was acting as an informant for the Los Angeles District Attorney and a claim that Owen instructed defense investigators not to investigate the case and instead diverted investigation funds to satisfy other obligations. The trial court rejected these arguments on the grounds that the claims were unsupported by the record and, even if true, would not have established that defendant was prejudiced by Owen's deficient performance. The trial court did not abuse its discretion in concluding that none of these claims constituted a basis for granting defendant's new trial motion.

## III.   DISPOSITION

The judgment of the superior court is affirmed.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Hoyt

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S113653
**Date Filed:** January 30, 2020

_____

**Court:**  Superior
**County:**  Santa Barbara
**Judge:**  William L. Gordon


_____

**Counsel:**

Roger Teich, under appointment by the Supreme Court, for Defendant Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Roger Teich
290 Nevada Street
San Francisco, CA 94110
(415) 948-0045

David F. Glassman
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2355